UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL HOCKEY LEAGUE,<br><br>    Plaintiff,<br><br>v.<br><br>JERRY MOYES, VICKIE MOYES, AND<br>THE JERRY AND VICKIE MOYES<br>FAMILY TRUST,<br><br>    Defendants. | Civil No.:<br><br><br>**NOTICE OF REMOVAL** |

Pursuant to 28 U.S.C. §§ 1441 and 1452 and Fed. R. Bankr. P. 9027(a), Defendants Jerry Moyes, Vickie Moyes, and the Jerry & Vickie Moyes Family Trust (collectively, "Moyes Defendants" or "Defendants") file this Notice of Removal removing this lawsuit from the Supreme Court of the State of New York, County of New York to this Court. The grounds for removing this case are as follows:

### The Complaint

1. On March 5, 2010, Plaintiff the National Hockey League ("NHL") commenced a civil action in the Supreme Court of the State of New York, County of New York against Jerry Moyes, Vickie Moyes, and the Jerry and Vickie Moyes Family Trust. A true and correct copy of the Complaint is attached to this Notice of Removal as Exhibit 1. The Complaint was received on March 9, 2010.

2. The NHL alleges various claims against the Moyes Defendants relating to and resulting from the Phoenix Coyotes hockey team filing Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Arizona. *See In re Dewey Ranch Hockey, LLC*, No. 09-bk-09488 (Bankr. D. Az. 2009); *In re Coyotes Holdings, LLC*, No. 09-bk-09500

1

(Bankr. D. Az. 2009); *In re Coyotes Hockey, LLC*, No. 09-bk-09491 (Bankr. D. Az. 2009); *In re Arena Management Group, LLC*, No. 09-bk-09495 (Bankr. D. Az. 2009) (collectively "Coyote Bankruptcy Proceedings").

3.    The NHL alleges that the Moyes Defendants breached a Consent Agreement and a Guaranty, and that Jerry Moyes aided and abetted a breach of fiduciary duty by taking actions that resulted in the Coyotes and the holding companies that own equity in the Coyotes filing bankruptcy petitions. Ex. 1 at 15. The NHL alleges that it has been damaged because it has been "forced to spend approximately ten million dollars to enforce its rights in the Coyotes' bankruptcy proceeding" and claims "approximately $20 million in losses" as a result of the NHL's decision to purchase the Coyotes in the Bankruptcy Proceedings. *Id.* at 3. The NHL also claims it is owed an additional "$11.6 million that the Coyotes owe to their unsecured creditors" in the Coyote Bankruptcy Proceedings and seeks "approximately $8 million" for which the NHL may be liable to former Coyotes coach Wayne Gretzky, depending on the results of the bankruptcy proceeding now in federal bankruptcy court in Arizona. *Id.* at 3-4. As the NHL's Complaint explains, "[w]hether the Coyotes owe Mr. Gretzky that amount will be determined in the Coyotes' bankruptcy case." *Id.* at 4.

## GROUNDS FOR REMOVAL

**I.    28 U.S.C. § 1452(a)**

4.    Under 28 U.S.C. § 1452(a), a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title [28 USCS § 1334]."

5.    Section 1334(b) explains that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to

2

cases under title 11." 28 U.S.C. § 1334(b). "Related to" jurisdiction "has been broadly interpreted to encompass any claim whose outcome might have any conceivable effect on the bankrupt estate." *Whitney Lane Holdings, LLC v. Don Realty, LLC*, No. 08-775, 2010 U.S. Dist. LEXIS 29778, at *10 (N.D.N.Y Mar. 26, 2010) (internal quotations omitted), *citing In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).

6.       A civil proceeding is "related to" a bankruptcy if "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively), and which in any way impacts upon the handling and administration of the bankrupt estate." *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, No. 04-708, 2004 U.S. Dist. LEXIS 8168, at *8 (S.D.N.Y. May 6, 2004) (quotations omitted) *citing In re Worldcom Inc. Sec. Litig.*, 293 B.R. 308, 317 (S.D.N.Y. 2003). A proceeding may be "related to" a bankruptcy even if it does not involve claims against the debtor or the debtor's property. *Id.* at *7-*8.

7.       Here, the NHL's claims against the Moyes Defendants filed in New York are "related to" the pending Coyote Bankruptcy Proceedings in the United States Bankruptcy Court for the District of Arizona because:

        a.       The Complaint contains allegations based on Defendants' alleged conduct within the Bankruptcy Court, including allegations that Jerry Moyes attempted "to use improperly certain provisions of the Bankruptcy Code to achieve his goal of transferring the club without NHL approval" (Ex. 1 at 3); "devised a plan to force this sale through over the objection of the NHL, using the power of the Bankruptcy Court" (*id.* at 15); and concocted a "scheme to misuse the Bankruptcy Court and sidestep the NHL's transfer of ownership and relocation processes, as well as the NHL's fundamental right to choose its own members to decide where they should be located" (*id.*).

b.      The alleged damages in the Complaint stem from actions taking place in the Bankruptcy Court, including allegations that "the NHL has been forced to spend approximately ten million dollars to enforce its rights in the Coyotes' bankruptcy proceeding." *Id.* at 3.

c.      As part of the Coyotes Bankruptcy Proceeding, the Bankruptcy Court is handling claims filed by unsecured creditors. The NHL's Complaint seeks to resolve issues that are also pending in the Bankruptcy Court before the Bankruptcy Court has a chance to act, including a determination of whether "the Coyotes owe their former coach Wayne Gretzky his unpaid salary, a claim in the amount of approximately $8 million." *Id.* at 3-4. As the Complaint explains, "[w]hether the Coyotes owe Mr. Gretzky that amount will be determined in the Coyotes' bankruptcy case." *Id.* at 4. And, whether any funds "are owed to Gretzky by Moyes personally or only by the Coyotes is an issue between Gretzky and Moyes (among others) *in the Coyotes' bankruptcy case.*" *Id.* at 17 (emphasis added).

8.      Based on these grounds and as demonstrated by Plaintiff's own allegations, this lawsuit is "related to" the Coyote Bankruptcy Proceedings in the United States Bankruptcy Court for the District of Arizona and removal is proper under 28 U.S.C. § 1452. As required by Fed. R. Bankr. P. 9027(a)(1), Defendants state that the claims asserted against them are non-core within the meaning of 28 U.S.C. § 157(b). Defendants do not consent to the entry of final orders or judgment by the bankruptcy judge.

**II.     28 U.S.C. § 1441(a)**

9.      Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants." The "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

4

10.     Plaintiff's Complaint asserts state law claims purportedly arising under state law. Nonetheless, removal is proper because Plaintiff's claims are federal bankruptcy claims disguised as state law claims.  It is well established that "[o]ne corollary of the well-pleaded complaint rule developed in the case law . . . is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987).  Under the federal preemption doctrine, "no authorized proceeding in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant." *Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003) (quotation and citation omitted). Removal to federal court is proper when the Plaintiff's allegations involve conduct relating to a bankruptcy proceeding because the "adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal.  It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process . . . ."  *Id.* at 263, *citing MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996).

11.     The crux of Plaintiff's Complaint is that "[a]t bottom, [Moyes' alleged conduct] was nothing more than a scheme to misuse the Bankruptcy Court and sidestep the NHL's transfer of ownership and relocation processes . . . ."  Ex. 1 at 15.  Each of the five counts in Plaintiff's Complaint is based on alleged conduct involving the Bankruptcy Court:

- Counts 1 & 2:  The first and second counts for alleged breaches of the consent agreement involve conduct that was part of both entering and litigating the bankruptcy.  *See id.* at 19 (claiming a breach of the "Consent Agreement by, among other things, . . . directing the Phoenix Coyotes and its affiliated holding companies to enter bankruptcy . . . .").  All of the damages sought under Counts 1

and 2 directly relate to damages the NHL alleges to have suffered because of its participation in the bankruptcy and decisions it made in the Bankruptcy Court. *See id.* at 19-20 (listing damages as "$10 million, representing the amounts spent by the NHL in opposing the Coyotes' bankruptcy and antitrust cases, (ii) the amount that the NHL must pay to fund the Coyotes' operating losses in the current season, presently estimated to be $20 million, and (iii) the amount, if any, that the price that the NHL realizes in a sale of the Coyotes is below the amount necessary to make the NHL whole in light of the purchase price paid by the NHL for the Coyotes in the Coyotes' bankruptcy case . . . .").

- Count 3: The third count for aiding and abetting a breach of fiduciary duty is also based on conduct that was part of the process of entering and litigating the bankruptcy, including allegations that Moyes aided and abetted a breach of fiduciary duty "by directing the Coyotes and its affiliated holding companies to file bankruptcy." *Id.* at 21.

- Counts 4 & 5: The fourth and fifth counts for breach of the guaranty again involve issues that are currently the subject of the bankruptcy proceeding—including the amount owed to creditors ("full and punctual payment of all debts, obligations and liabilities of the Coyotes") and the liability of the "Gretzky Obligation"—and which are pending before the Bankruptcy Court. *Id.* at 22-23.

12.    The bankruptcy laws are to be construed broadly, which has resulted in at least one court in this district finding that a state law "allegation that the defendant induced a third party to file for bankruptcy, harming the plaintiff" is preempted by federal law. *Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 262-63 (S.D.N.Y. 2003), *citing Eastern Equip. & Servs. Corp. v.*

*Factory Point Nat'l Bank*, 236 F.3d 117 (2d Cir. 2001). Because Plaintiff's claims are governed by the federal bankruptcy laws, removal is proper pursuant to 28 U.S.C. § 1441.

## TIMELINESS AND NOTICE

13.     Defendants have timely filed this Notice of Removal within thirty (30) days of receiving the Complaint in accordance with 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3).

14.     All defendants who have been served in this action have joined in this Notice of Removal.

15.     In accordance with 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the clerk of the Supreme Court of the State of New York, County of New York and Defendants will serve this Notice of Removal on all parties.

## PRAYER

16.     Defendants respectfully request that this Court accept this Notice of Removal and grant it any other relief the Court deems just and proper.

Date:   April 8, 2010
        New York, New York

                                        Respectfully submitted,

                                        Stephen D. Susman (SS8591)
                                        Rebecca S. Tinio  (RT3746)
                                        SUSMAN GODFREY L.L.P.
                                        654 Madison Avenue, 5th Floor
                                        New York, New York  10065
                                        (212) 336-8330
                                        (212) 336-8340 (fax)

                                        *Counsel for Defendants Jerry Moyes, Vickie*
                                        *Moyes and The Jerry and Vickie Moyes*
                                        *Family Trust*

7

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2010, I served the foregoing document on the persons identified below via hand-delivery and email:

Bradley I. Ruskin
Scott A. Eggers
David S. Mordkoff
Proskauer Rose LLP
1585 Broadway
New York, NY  10036

Rebecca S. Tinio

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NATIONAL HOCKEY LEAGUE,

                              Plaintiff,

        -against-

JERRY MOYES, VICKIE MOYES, AND
THE JERRY AND VICKIE MOYES
FAMILY TRUST,

                              Defendants.

Index No.: _____

Date Purchased: _____

Plaintiff designates New York County
as place of trial

SUMMONS      1 0 6 0 0 5 6 8

*Venue in this action is based upon:*
1.  Plaintiff's residence in County of New
York; and
2.  Contractual provision fixing venue.

**TO THE ABOVE NAMED DEFENDANT(S):**

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, New York
        March 5, 2010

                              PROSKAUER ROSE LLP

[FILED]    By: /s/ _____

MAR 0 5 2010          Bradley I. Ruskin, Esq.
                      Scott A. Eggers, Esq.
COUNTY CLERK'S OFFICE David S. Mordkoff, Esq.
NEW YORK             1585 Broadway
                      New York, New York 10036
                      (212) 969-3000 (*tel*); (212) 969-2900 (*fax*)
                      *Attorneys for Plaintiff National Hockey League*

TO:  Jerry Moyes
13327 N. 65th Dr.
Glendale, AZ  85304-1005

Vickie Moyes
13327 N. 65th Dr.
Glendale, AZ  85304-1005

The Jerry and Vickie Moyes Family Trust
c/o Jerry & Vickie Moyes (trustees)
13327 N. 65th Dr.
Glendale, AZ  85304-1005

2

**INDEX NUMBER**     **2010**

SUPREME COURT OF THE STATE OF NEW YORK/COUNTY OF NEW YORK

NATIONAL HOCKEY LEAGUE,

Plaintiff

-against-

JERRY MOYES, VICKIE MOYES, AND THE JERRY AND VICKIE MOYES FAMILY TRUST,

Defendants.

**SUMMONS**

Proskauer»

Attorneys for Plaintiff,
1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000

to

All communications should be referred

Bradley I. Ruskin, Esq.
Scott A. Eggers, Esq.
David S. Mordkoff, Esq.

Due service of a copy of the within _____ is hereby admitted

Dated, New York   March 5, 2010

To

Attorneys for

---

Sir:

Please take notice that the within is a true copy of _____ this day duly entered and filed herein in the office of the clerk of _____ of New York

Dated, New York     20

Yours, etc.,

Proskauer»

Attorneys for
1585 Broadway
New York, NY 10036-8299

To

Attorneys for

Sir:

Please take notice that an order of which the within is a true copy will be presented for settlement and signature herein

to

at

this Court at

in the Borough of    of

City of New York,

on the    day of     ,20

at    o'clock in the    noon.

Dated, New York,    20

Yours, etc.,

Proskauer»

Attorneys for
1585 Broadway
New York, NY 10036-8299

To

Attorneys for

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

10800568

NATIONAL HOCKEY LEAGUE,

                           Plaintiff,

- against -

JERRY MOYES, VICKIE MOYES, AND THE
JERRY AND VICKIE MOYES FAMILY
TRUST,

                           Defendants.

Civil Action No.

**COMPLAINT**

|FILED|

MAR 0 5 2010

COUNTY CLERK'S OFFICE
NEW YORK

Plaintiff the National Hockey League ("NHL"), by its attorneys Proskauer Rose LLP, for

its complaint against Jerry Moyes ("Moyes"), Vickie Moyes, and The Jerry and Vickie Moyes

Family Trust ("Moyes Trust") (collectively, the "Moyes Parties"), alleges as follows:

## NATURE OF THE ACTION

1.      Jerry Moyes and his family own Swift Transportation, one of the largest trucking

companies in the United States, with a fleet of over 17,000 trucks and approximately $3.4 billion

in annual revenue.  The Moyes Parties, through several entities that they own, also owned

approximately 92% of an NHL Member Club called the Phoenix Coyotes (the "Coyotes").

2.      The Moyes Parties entered into a contract with the NHL, dated September 27,

2006, called the "Consent Agreement."  A copy of the Consent Agreement is annexed to this

Complaint as Exhibit A.

3.      In the Consent Agreement, the NHL gave its consent to the Moyes Parties' 2006

purchase of a super-majority interest in the Coyotes.  In exchange for that consent, the Moyes

Parties made many promises to the NHL, including that the Moyes Parties would not seek to

move the team out of Phoenix for a period of seven years, would not enter into any discussions

with potential purchasers who would seek to move the team out of Phoenix without prior NHL

consent, would follow the NHL Constitution and Bylaws, would personally ensure that the team had adequate capital to pay its expenses, and would not cause the Coyotes to file a bankruptcy petition, among other things. The Moyes Parties agreed that they would be jointly and severally liable for any breach of those obligations under the Consent Agreement.

4.      The Moyes Parties also provided the NHL with a Guaranty on September 27, 2006 (the "Guaranty"). A copy of the Guaranty is annexed to this Complaint as Exhibit B.

5.      Pursuant to the Guaranty, the Moyes Parties assumed joint and several personal liability to the NHL for certain defined obligations including, among other things, the funding of the operating costs of the Coyotes, the amounts owed by the Coyotes to the organization's players and employees and the payment of all debts, liabilities and obligations of the Club.

6.      In October 2008, in violation of his obligations under the Consent Agreement, Jerry Moyes informed the NHL that the Moyes Parties would no longer fund the Coyotes. Moyes requested that the NHL fund the Coyotes' operating expenses instead. The NHL began funding those expenses pursuant to the terms of a Secured Credit Agreement, and also began efforts to find a buyer for the Coyotes. The NHL identified and entered into discussions with one such group, which signed a letter of intent to purchase the Coyotes.

7.      Unbeknownst to the NHL, however, Moyes himself had also secretly entered into discussions regarding the potential sale of the Coyotes to an affiliate of Jim Balsillie, the founder of Blackberry maker Research in Motion. Moyes lied to the NHL about having those discussions, while at the same time appealing to the NHL for financing and for assistance in selling the team. Moyes agreed with Balsillie that in order to attempt to accomplish the sale without the required NHL approval, he would file a bankruptcy petition for the Coyotes.

-2-

8.     On May 5, 2009, while the NHL Commissioner was in Phoenix to report to Moyes on the details of the proposed purchase of the Coyotes that the NHL had arranged, Moyes caused the Coyotes and the holding companies that own the equity in the Coyotes to file bankruptcy petitions.  That same day, Moyes also signed the agreement he had secretly negotiated to sell all of the Coyotes' assets to Balsillie.  Three days later, the Coyotes filed an antitrust lawsuit against the NHL.

9.     Moyes's secret discussions with Balsillie, his participation in negotiations to sell the Coyotes, his entry into an agreement with Balsillie conditioned on moving the franchise out of Phoenix, his filing of a bankruptcy petition for the Coyotes, his lawsuit challenging the NHL Constitution and Bylaws, and his attempt to use improperly certain provisions of the Bankruptcy Code to achieve his goal of transferring the club without NHL approval, among other things, all violated the Moyes Parties' obligations under the Consent Agreement.

10.     The Moyes Parties, jointly and severally, agreed to indemnify the NHL for any loss or damage that the NHL incurs by reason of their breaches of the Consent Agreement.  The NHL seeks recovery of such losses in this case.  Among other things, the NHL has been forced to spend approximately ten million dollars to enforce its rights in the Coyotes' bankruptcy proceeding.  In addition, in order to minimize the damage that the Moyes Parties' actions have caused, the NHL was forced to purchase the Coyotes.  The NHL expects to incur approximately $20 million in losses as a result of that purchase in the current NHL season.

11.     Under the Guaranty and the Consent Agreement, the Moyes Parties are liable to the NHL for all amounts owed to creditors of the Coyotes.  Those amounts include $11.6 million that the Coyotes owe to their unsecured creditors, which the NHL has paid.  In addition, according to Moyes, the Coyotes owe their former coach Wayne Gretzky his unpaid salary, a

- 3 -

claim in the amount of approximately $8 million. Whether the Coyotes owe Mr. Gretzky that amount will be determined in the Coyotes' bankruptcy case. The NHL seeks to recover in this case, for the benefit of Mr. Gretzky, the amount that it is decided the Coyotes owe to Mr. Gretzky.

12.    In addition, Moyes deliberately inflicted an injury on the NHL in violation of the fiduciary duty that the Coyotes owe to the NHL. While Moyes pretended to cooperate with the NHL in seeking a buyer for the franchise, and in return was able to receive millions of dollars in financing from the NHL, he was secretly plotting to force a sale to Balsillie, using a litigation strategy designed to force the league to defend its core rights as a sports league. That plan has not succeeded, but Moyes cannot escape responsibility for the costs that he inflicted on the Coyotes' partners in the NHL.

13.    For the Moyes Parties' violations of the Consent Agreement, the NHL seeks an award of damages, presently estimated to be at least $30 million. For aiding and abetting the violations of the Coyotes' fiduciary duty to the NHL, the NHL seeks an award of compensatory damages against Jerry Moyes in the amount of at least $10 million, and punitive damages of $10 million for his malicious conduct. Moyes acted with knowledge of the NHL's rights and a deliberate intention to interfere with those rights. In addition, the NHL seeks to recover $11.6 million under the terms of the Guaranty that the Moyes Parties gave to the NHL and an additional amount of approximately $8 million, if it is determined that the Coyotes owe that amount to Wayne Gretzky, for the benefit of Mr. Gretzky.

## THE PARTIES

14.    Plaintiff National Hockey League (previously defined herein as "NHL") is a joint venture of professional ice hockey Member Clubs organized as an unincorporated association, with its headquarters in New York, New York. The NHL is the premier professional ice hockey

- 4 -

league in the world and is comprised of 30 Member Clubs in the United States and Canada, including the Phoenix Coyotes.

15.     Defendant Jerry Moyes is an individual whose principal place of residence is in Glendale, Arizona, a suburb of Phoenix.  Jerry Moyes owns 99% of Coyotes Holdings MemberCo., LLC, ("MemberCo.") which in turn owns 24.86% of Coyotes Holdings LLC ("Coyotes Holdings"), which in turn owned a majority share of the Phoenix Coyotes franchise until the purchase of that franchise by the NHL in November 2009.  Jerry Moyes is the husband of Defendant Vickie Moyes.

16.     Defendant Vickie Moyes is an individual whose principal place of residence is in Glendale, Arizona.  Vickie Moyes owns 1% of MemberCo, which in turn owns 24.86% of Coyotes Holdings.  Vickie Moyes is the wife of Defendant Jerry Moyes.

17.     Defendant The Jerry and Vickie Moyes Family Trust (the "Moyes Trust") is a trust organized on December 11, 1987, under the laws of the State of Arizona.  Defendants Jerry and Vickie Moyes are the co-trustees and beneficiaries of the Moyes Trust.  The Moyes Trust owns 75.14% of Coyotes Holdings.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the Moyes Parties pursuant to the terms of the Consent Agreement.  Specifically, in section 12(r) of the Consent Agreement, the Moyes Parties each agreed to the exclusive jurisdiction of this Court (and of the federal courts for this judicial district in an appropriate case) over the person of the defendants.

19.     This Court also has jurisdiction over the defendants pursuant to CPLR § 302 (a)(1), in that the defendants transacted business within this State and, as to defendant Jerry Moyes, under CPLR §302(a)(3), in that the defendant Jerry Moyes committed a tortious act without the State causing injury within the State and regularly does business or engages in a

- 5 -

persistent course of conduct in this State, and reasonably expected his actions to have consequences in this State and derives substantial revenue from interstate and international commerce.

20.     Venue is proper in this Court pursuant to CPLR § 501 as each of the defendants has submitted to venue in this Court pursuant to the Consent Agreement.  Venue is also proper in this Court under CPLR § 503(a) and (d), as the NHL has its principal office in this County.

## FACTUAL ALLEGATIONS

A.     **The Ownership Structure of the Phoenix Coyotes NHL Franchise**

21.     The Phoenix Coyotes are a member of the Pacific Division of the Western Conference of the NHL.

22.     In 2001, the Coyotes were purchased by a Phoenix-area real estate developer named Steven Ellman, along with a group of other investors.

23.     Until September 2006, Mr. Ellman and Jerry Moyes both had interests in the Westgate City Center Development, a shopping and entertainment development in Glendale that includes the Jobing.com Arena where the Coyotes play their home games.  In September 2006, Jerry Moyes entered into an agreement with Mr. Ellman that left Mr. Ellman and certain of his affiliates in control of the Westgate City Center Development.  Defendants Jerry and Vickie Moyes, through various affiliated entities, including the Moyes Trust, became the super-majority owners of the Coyotes.

24.     In accordance with the NHL Constitution and Bylaws, the transfer of the super-majority interest in the Coyotes to the Moyes Parties required the consent of the NHL Board of Governors.  In connection with that transaction, the Moyes Parties, the NHL, and various other individuals and entities entered into the Consent Agreement, dated September 27, 2006.

- 6 -

25.   Under the Consent Agreement, the NHL approved the transaction by which the Moyes Parties became the super-majority owners of the Coyotes.  In return, the Moyes Parties agreed to certain specific conditions.  Among other things, the Consent Agreement confirms the Moyes Parties' agreement to be bound by the NHL Constitution and Bylaws, to fund the team (subject to ceding control to the NHL if they fail to do so), to operate the team in its current location, and to abide by the NHL's rules and procedures, including those governing ownership transfers and relocation.

26.   The Moyes Parties agreed in the Consent Agreement that they would have joint and several personal liability for the obligations of the entities that owned the Coyotes.  The Moyes Parties also agreed to a personal guarantee of certain obligations of the Coyotes (defined above as the Guaranty).  The Consent Agreement and the Guaranty are discussed further below.

27.   Through a series of limited liability companies and trusts, Defendants Jerry Moyes and Vicki Moyes owned approximately 92% of the equity in the Coyotes.  The ownership structure of the Coyotes, and the Moyes Parties' place within that structure, is explained in the chart attached hereto as Exhibit C, and further detailed as follows.

28.   The NHL franchise for Phoenix was, until November 2, 2009, owned by a Delaware limited liability company called Coyotes Hockey, LLC ("Coyotes Hockey").

29.   Another Delaware limited liability company called Coyotes Holdings, LLC is the Managing Member and owner of 91.79% of the units of Coyotes Hockey.  The remaining 8.21% of the units of Coyotes Hockey are held by six minority investors.

30.   Defendant the Moyes Trust owns 75.14% of Coyotes Holdings.  A limited liability company called Coyotes Holdings MemberCo., LLC ("MemberCo") owns the

- 7 -

remaining 24.86% of Coyotes Holdings. Defendant Jerry Moyes owns 99% of MemberCo.

Defendant Vickie Moyes owns 1% of MemberCo.

**B.   The Principal Provisions of The Consent Agreement**

31.   In the Consent Agreement, the Moyes Parties agreed that their acquisition of a

super-majority ownership interest in the Phoenix Coyotes was solely for the purpose of operating

the Club in Phoenix, Arizona. The Moyes Parties specifically agreed that for a period of at least

seven years from the date of the Consent Agreement, they were not even permitted to discuss a

possible relocation of the franchise without NHL approval:

> (c) . . . for a period of at least seven (7) calendar years from the
> date hereof, [the Moyes Parties] will not (i) move or transfer,
> request to move or transfer, or attempt to move or transfer, the
> Franchise to a new Home Territory, (ii) engage or participate in
> discussions or negotiations with a third party relating to moving or
> transferring the Franchise to a new Home Territory....

Consent Agreement §4(c).

32.   The Moyes Parties also agreed that they would never seek to sell or to relocate the

franchise without the NHL's prior written consent:

> The ownership of the Franchise, any proposed transfer of the
> location of the Franchise and any proposed Transfer of any of the
> assets of, or any direct or indirect ownership or other interest in,
> any Investment Parties, including, without limitation, the Club, are
> subject to and conditioned upon the NHL Constitution and
> Agreements, including the NHL's prior written consent, which
> consent the NHL may withhold in its sole discretion.

Consent Agreement §6(c)(i).

33.   In the Consent Agreement, the Moyes Parties also agreed, among other things,

that they and their affiliates would:

> (i)   Be bound by and comply with the NHL Constitution and Bylaws (*id.*
>
>        §3(a)(i));

- 8 -

(ii)   Not take or support any actions that may be inconsistent with any NHL obligations, or with the NHL Constitution or Bylaws, or which may have a material adverse impact on the NHL or the NHL Member Clubs (*id.* § 3(a)(ii));

(iii)  Not take any actions that would impair the debts, liabilities or obligations of the Coyotes (*id.* § 3(b));

(iv)   Not seek to sell the Coyotes, or transfer the location of the Coyotes, without the NHL's prior written consent (*id.* § 6(c)(i));

(v)    Not cause or permit any transaction that would result in a change, directly or indirectly, in the ownership or management of the Coyotes without the NHL's prior written consent (*id.* § 6(c)(ii)(C, D));

(vi)   Provide to the Coyotes from time to time all amounts necessary to provide the Coyotes with a minimum of $10 million in Net Working Capital and to otherwise pay all Operating Expenses in the ordinary course and in a timely fashion (*id.* § 7(d)(i));

(vii)  Guarantee to and for the benefit of the NHL the full and punctual payment and performance of all Operating Expenses of the Coyotes (*id.* § 7(d)(ii));

(viii) Follow the direction of the NHL Commissioner as proxy with respect to directing the Coyotes and/or its affiliated holding companies to enter bankruptcy (*id.* § 7(f)(B));

(ix)   Follow the direction of the NHL Commissioner as proxy with respect to directing the sale of the equity interests in the Coyotes, or the sale of all or

- 9 -

substantially all of the assets of the Coyotes and/or its affiliated holding companies (*id.* § 7(f)(D, E)).

34.     The Consent Agreement contains a separate indemnity obligation in section 11(c). Under that indemnity obligation, the Moyes Parties jointly and severally agreed to indemnify and to hold the NHL harmless from any and all losses, damages, costs and expenses that it may incur arising out of, attributable to, or relating to any breach of the Consent Agreement.  The Moyes Parties also agreed to indemnify the NHL for all costs and expenses, including without limitation all reasonable attorneys' fees and expenses, incurred or expended by the NHL as a result of any breach of the Consent Agreement.

35.     Specifically, Section 11(c) of the Consent Agreement provides, in relevant part:

> Without limiting any other rights the NHL may have, the [Moyes Parties] . . . agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with Affiliated NHL Parties) (collectively, "Losses") incurred or required to be paid by an Affiliated NHL Party, arising out of, attributable to or relating to: . . . (ii) any act, omission, liability or obligation (including, without limitation, all obligations set forth in this Consent Agreement and/or any other Relevant Agreements) of any Seller Party, Other Seller Party, the Club, any other Investment Party, any of their subsidiaries or other affiliates or any of their respective former or present shareholders, partners, members, managers, investors, directors, officers, employees, representatives or agents, or (iii) any breach of any warranty, covenant or agreement or any misrepresentation in this Consent Agreement or any other Relevant Agreements by any Seller Party, the Club or any other Investment Party.

36.     In Section 3(a) of the Consent Agreement, the Moyes Parties agreed that, in addition to the NHL Constitution and Bylaws, they would be bound by, and would cause their affiliates to comply with, all rules, regulations and policies of the NHL:

- 10 -

(i) [The Moyes Parties jointly and severally] agree to be bound by, and to cause their respective subsidiaries and other affiliates to comply with:  (A) the NHL Constitution, (B) the NHL By-laws, (C) the governing documents of each of the NHL [and certain related entities], (D) all other existing or future rules, regulations, interpretations, memoranda, procedures, directives, policies, guidelines and resolutions of each of the NHL Entities, (E) the current and future Collective Bargaining Agreements between the NHL and the National Hockey League Players' Association (the "NHLPA") ..., (F) this Consent Agreement, (G) the other Relevant Agreements, and (H) the NHL Commissioner's interpretation of, opinions concerning, and the custom and practice under any of the foregoing, as may be amended from time to time (collectively, the "NHL Constitution and Agreements");

37.   The NHL Constitution and the NHL Bylaws, which bind all NHL Member Clubs, provide that no sale of any NHL Member Club may be effected, nor may any franchise be relocated, without complying with the NHL's rules and procedures governing such actions and obtaining NHL approval.

38.   Rule 1 of the "NHL Ownership Transfer Procedures – Preliminary Qualification Procedures" prohibits an owner from entering into a confidentiality agreement or similar arrangement with respect to negotiations over the sale or transfer of ownership of an NHL franchise without first notifying the NHL Commissioner.

C.   **The Principal Provisions of The Guaranty**

39.   In addition to the Consent Agreement, the Moyes Parties also executed the Guaranty, dated September 27, 2006, in connection with their acquisition of a super-majority ownership interest in the Coyotes.

40.   In the Guaranty, the Moyes Parties agreed to guarantee, for the benefit of the NHL, the obligation of the Moyes Parties to ensure, among other things, that the Coyotes would pay all of their debts and obligations, including, but not limited to, all obligations of the Coyotes to the NHL and to its employees.

- 11 -

41.    Specifically, under the Guaranty, the Moyes Parties agreed as follows:

> jointly and severally, [the Moyes Parties] do hereby absolutely and unconditionally and irrevocably, to and for the benefit of the [NHL]: (i) guarantee and agree to provide to the Club from time to time such amounts as from time to time may be necessary for the Club to: (A) maintain a minimum of $10 million of Net Working Capital, and (B) otherwise pay all Operating Expenses in the ordinary course and in a timely fashion; and (ii) guarantee the full and punctual payment and performance of all debts, obligations and liabilities of the Club, whether now or hereafter arising and however incurred, including, but not limited to, all debts, obligations and liabilities of the Club under the Consent Agreement....

Guaranty §2.

42.    The liability of the Moyes Parties under the Guaranty was capped at $30 million. In connection with the NHL's purchase of the Coyotes franchise, the NHL agreed to reduce that cap from $30 million to $15 million.

**D.    Moyes Decides To Stop Funding The Operating Expenses Of The Coyotes**

43.    The Coyotes suffered operating losses in every year since the Moyes Parties became super-majority owners. In or about August 2008, the NHL learned that the Moyes Parties were having difficulty continuing to fund the operating expenses of the Coyotes and that Jerry Moyes was seeking financial assistance from the NHL. On August 28, 2008, the NHL agreed to advance up to $6 million of the Coyotes' anticipated share of national broadcast revenues and revenue sharing funds due to be distributed in October 2008.

44.    In mid-October of 2008, in violation of his obligations under the Consent Agreement and the Guaranty, Jerry Moyes informed the NHL that he would no longer fund the Club's operations. Moyes requested that the NHL provide additional financial assistance to the Coyotes.

- 12 -

45.     Jerry Moyes met with NHL Commissioner Gary Bettman and NHL Deputy Commissioner Bill Daly on November 3, 2008, to discuss the NHL's potential funding of the Coyotes' operating expenses.  In order to permit the Coyotes to play their scheduled games for the 2008-2009 season, to protect the value of the Coyotes franchise, and to protect the integrity of the NHL league schedule, the NHL agreed to provide certain funding to the Coyotes.  The NHL also undertook to locate a buyer for the Club who would agree to keep the Coyotes in Phoenix.

46.     Beginning in November 2008, the NHL provided financial assistance to the Coyotes to fund various operational expenses.  This financial assistance took the form of advances of certain revenue sharing funds that were due to the Coyotes later in the season, in the total amount of approximately $25 million, as well as loans from the NHL pursuant to the terms of a Secured Credit Agreement.  The total amount of those loans as of the date of the Coyotes' bankruptcy filing in May 2009 was approximately $13.3 million (the "NHL Loans").

**E.      Moyes Secretly Negotiates A Contract To Sell The Coyotes**

47.     Beginning in November 2008, when the NHL began funding the Coyotes through a series of advances and later through loans, the NHL was working to locate a potential buyer of the Coyotes who would be willing to commit to leaving the club in Phoenix.  Unfortunately, Moyes was secretly negotiating his own deal with another buyer who had a very different plan.

48.     The NHL secured the interest of a prominent owner of several professional sports clubs to bid to acquire the Coyotes.  In May 2009, this potential purchaser signed a letter of intent to purchase the Coyotes and to keep the club in Arizona.

49.     While the NHL acted in good faith in attempting to find a suitable buyer for the Moyes Parties' ownership interest in the Coyotes, and was funding the team through multiple cash infusions, Moyes was secretly negotiating a sale of the Coyotes to a company owned by Jim

- 13 -

Balsillie, co-CEO of Research in Motion, the makers of the Blackberry handheld device. Balsillie had twice before unsuccessfully tried to acquire NHL clubs – the Pittsburgh Penguins and the Nashville Predators.

50.     Moyes knew — because of Balsillie's history with the NHL and because he was conditioning his interest in purchasing the Coyotes on his ability to relocate the Club — that there would likely be significant issues in connection with the NHL's approval of a sale to Balsillie, and that the NHL would take additional steps to enforce its rights under the Consent Agreement and Guaranty.

51.     Moyes therefore kept his negotiations with Balsillie secret from the NHL. Moyes also had his representative lie to the NHL about the existence of those discussions. On or about Friday, May 1, 2009, the NHL Commissioner spoke with Earl Scudder ("Scudder"), a lawyer representing Moyes with respect to a potential sale of the Coyotes. Scudder lied to the Commissioner about his ongoing negotiations to sell the Club. Scudder told the Commissioner that he was not pursuing any transactions with respect to the Club. In reality, Moyes had nearly completed his negotiations to sell the Club to Balsillie.

52.     Moyes also understood that by engaging in secret negotiations with Balsillie, he was violating his contractual obligations to the NHL, including the obligations set forth in the Consent Agreement. While the NHL Commissioner and Deputy Commissioner were in Phoenix to present to the Moyes Parties a signed letter of intent from a potential purchaser, Moyes secretly decided to file a voluntary bankruptcy petition for the Coyotes and all of the entities in the chain of ownership. That bankruptcy filing was the first time that Moyes disclosed to the NHL that he had negotiated a deal to sell the Coyotes to Balsillie.

- 14 -

**F.      The Moyes Parties Cause The Coyotes To File Bankruptcy And To**
        **Sue The NHL In An Effort To Circumvent the Consent Agreement**

53.    On May 5, 2009, in agreement with Balsillie, Moyes directed Dewey Ranch Hockey, Coyotes Holdings, Coyotes Hockey, and Arena Management Group, LLC to file voluntary chapter 11 bankruptcy petitions in the United States Bankruptcy Court in Phoenix.

54.    On the same day, Moyes, on behalf of Coyotes Hockey entered into an Asset Purchase Agreement with PSE Sports & Entertainment LP ("PSE"), an entity affiliated with Balsillie.

55.    Under the Asset Purchase Agreement, the Moyes Parties agreed to sell the Phoenix Coyotes to PSE upon approval of the sale by the Bankruptcy Court. It was a condition of the sale that the Bankruptcy Court enter an order providing that the club could be transferred to Southern Ontario, over the objection of the NHL if necessary. The Asset Purchase Agreement was also conditional on essentially voiding the Coyotes' long-term arena lease with the City of Glendale.

56.    The Moyes Parties did not own a Member Club in Southern Ontario. They owned a Member Club in Phoenix, Arizona. The Moyes Parties had no right to sell a Club in Ontario. Under the deal that Moyes had struck with Balsillie, however, Moyes was trying to sell a right that he did not own, and to appropriate to himself the opportunity to sell a Club in Ontario, an opportunity that belongs to the NHL and all of its 30 Member Clubs. In conjunction with Balsillie, Moyes devised a plan to force this sale through over the objection of the NHL, using the power of the Bankruptcy Court. At bottom, this was nothing more than a scheme to misuse the Bankruptcy Court and sidestep the NHL's transfer of ownership and relocation processes, as well as the NHL's fundamental right to choose its own members and to decide where they should be located.

- 15 -

57.     In secretly negotiating with Balsillie, in directing the Coyotes and their affiliated holding companies to enter bankruptcy, and in agreeing to the Asset Purchase Agreement with PSE and Balsillie without the consent and approval of the NHL, the Moyes Parties violated the express terms of the Consent Agreement, including for example:

    (i)     The Moyes Parties' obligation under Section 3(a)(i) to be bound by the NHL Constitution and Agreements;

    (ii)    The Moyes Parties' obligation under Section 3(a)(ii) not to take or cause their respective subsidiaries or affiliates to take any actions which may be inconsistent with any NHL obligations or the NHL Constitution or Agreements or which may have a material adverse impact on the NHL or the NHL Member Clubs;

    (iii)    The Moyes Parties' obligation under Section 4(c) for seven years not to engage or participate in discussions or negotiations with a third party relating to moving or transferring the Phoenix Coyotes to a new location;

    (iv)    The Moyes Parties' obligation under Section 6(c)(i) to condition any proposed transfer of the ownership and/or the location of the Phoenix Coyotes or any of its affiliated holding companies on the NHL Constitution and Agreements, including the NHL's prior written consent.

58.     The NHL has suffered extensive damage from the Moyes Parties' breaches of the Consent Agreement, and from the Coyotes' breach of its fiduciary duty to the NHL. This damage includes, but is not limited to, (1) causing the NHL to expend substantial resources funding the operations of the Phoenix Coyotes; (2) causing the NHL to expend substantial resources searching for and negotiating with potential buyers of the Phoenix Coyotes;

- 16 -

(3) causing the NHL to expend substantial resources to enforce its rights under the Consent Agreement and Guaranty, including substantial attorneys' fees; (4) causing the NHL to expend substantial resources defending its rights under the Consent Agreement and the NHL Constitution and Bylaws in the bankruptcy proceedings in the District of Arizona, including substantial attorneys' fees; (5) damaging the credibility of the NHL and NHL Member Clubs with fans, municipalities, sponsors, broadcasters, vendors, and potential ownership groups; (6) threatening the integrity of the 2009-2010 NHL schedule and season; and (7) other injuries to be determined at trial.

G. **The Moyes Parties Guaranteed The Salaries Of The Coyotes' Employees, <u>Including Former Head Coach Wayne Gretzky</u>**

59.     Until the start of the current 2009-2010 NHL season, the Coyotes were coached by Wayne Gretzky ("Gretzky"), who is owed at least $8 million in salary and deferred salary payments (the "Gretzky Obligations"). Whether those amounts are owed to Gretzky by Moyes personally or only by the Coyotes is an issue between Gretzky and Moyes (among others) in the Coyotes' bankruptcy case. Moyes has taken the position in the Coyotes' bankruptcy case that the Gretzky Obligations are not his personal obligations, but rather obligations of the Coyotes. If that is so, the NHL has the right to enforce the Gretzky Obligations against the Moyes Parties personally, for the benefit of Gretzky, pursuant to the terms of the Guaranty.

60.     Under the Guaranty, the Moyes Parties agreed that they would "guarantee the full and punctual payment and performance of all debts, obligations and liabilities of the Club, whether now or hereafter arising and however incurred." Guaranty §2. Under the Consent Agreement, the Moyes Parties agreed to pay "all Operating Expenses in the ordinary course and in a timely fashion." Consent Agreement §7(d)(i)(B).

- 17 -

61.     The "Operating Expenses" that the Moyes Parties guaranteed include "any sums required to pay, or to cure defaults in the payment of, salaries, bonuses, deferred compensation, pension contributions, and any other compensation earned by any and all of the Club's players and other Club employees." Consent Agreement §7(c). The Gretzky Obligations are "Operating Expenses" of the Coyotes under the terms of the Consent Agreement and the Guaranty.

62.     Furthermore, under the Consent Agreement, the "NHL shall be permitted, in its sole discretion, to pay any and all sums received pursuant to this Paragraph 7 to any third party or parties to which the obligations of the Club Parties are owed." Consent Agreement §7(d). In section 7(e) of the Consent Agreement, the Moyes Parties agreed that "the NHL is a direct beneficiary [of the agreement to pay the "Operating Expenses" of the Coyotes and] shall have the right to require that the agreements set forth in Paragraphs 7(a) and (d) hereof be enforced in accordance with their terms."

63.     Gretzky falls under the definition of "Investment Parties" on page 1 of the Consent Agreement. Pursuant to section 7(d) of the Consent Agreement and section 2(a) of the Guaranty, the Gretzky Obligations are therefore not included within the $30 million (now a $15 million) cap.

**H.     The Moyes Parties Have Refused Payment of the Money Owed Under the Guaranty**

64.     Pursuant to the Guaranty, the Moyes Parties are jointly and severally liable for the Guaranteed Obligations up to $15 million (except that the Gretzky Obligations are not limited by – or included in – this cap).

65.     The Moyes Parties have refused to pay or otherwise satisfy their obligations under the Guaranty.

- 18 -

## COUNT I

### Breach Of the Consent Agreement
### (Against All Defendants)

66.     The NHL repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth here.

67.     The Moyes Parties signed the Consent Agreement with the NHL and certain other individuals and entities on September 27, 2006.

68.     The Consent Agreement is a valid and binding contract.

69.     The Moyes Parties are jointly and severally liable for any breaches of the Consent Agreement.

70.     The Moyes Parties breached the Consent Agreement by, among other things, conducting secret negotiations with Balsillie and his agents regarding the potential sale and relocation of the Coyotes, by signing the Asset Purchase Agreement with PSE, by directing the Phoenix Coyotes and its affiliated holding companies to enter bankruptcy and by suing the NHL to invalidate the transfer restrictions contained in the Consent Agreement, and in the NHL Constitution and By-Laws.

71.     As a result of the Moyes Parties' breaches of the Consent Agreement, the NHL has been damaged in an amount to be determined at trial, but not less than (i) $10 million, representing the amounts spent by the NHL in opposing the Coyotes' bankruptcy and antitrust cases, (ii) the amount that the NHL must pay to fund the Coyotes' operating losses in the current season, presently estimated to be $20 million, and (iii) the amount, if any, that the price that the NHL realizes in a sale of the Coyotes is below the amount necessary to make the NHL whole in

- 19 -

light of the purchase price paid by the NHL for the Coyotes in the Coyotes' bankruptcy case and the losses incurred by the franchise in the current season that the NHL must fund.

### COUNT II

#### Breach of the Indemnity Provisions of the Consent Agreement
(Against All Defendants)

72.     The NHL repeats and realleges the allegations in paragraphs 1 through 71 as if fully set forth here.

73.     The Consent Agreement contains a separate indemnity obligation in section 11(c). Under that indemnity obligation, the Moyes Parties jointly and severally agreed to indemnify and to hold the NHL harmless from any and all losses, damages, costs and expenses that it may incur arising out of, attributable to, or relating to any breach of the Consent Agreement.

74.     As a result of the Moyes Parties' breaches of the Consent Agreement detailed above, the NHL has been damaged in an amount to be determined at trial, but not less than (i) $10 million, representing the amounts spent by the NHL in opposing the Coyotes' bankruptcy and antitrust cases, (ii) the amount that the NHL must pay to fund the Coyotes' operating losses in the current season, presently estimated to be $20 million, and (iii) the amount, if any, that the price that the NHL realizes in a sale of the Coyotes is below the amount necessary to make the NHL whole in light of the purchase price paid by the NHL for the Coyotes in the Coyotes' bankruptcy case and the losses incurred by the franchise in the current season that the NHL must fund.

75.     In Section 11(c) of the Consent Agreement, the Moyes Parties also agreed to indemnify the NHL for all reasonable attorneys' fees and expenses incurred or expended by the NHL as a result of any breach of the Consent Agreement.

- 20 -

## COUNT III

### Aiding And Abetting A Breach of Fiduciary Duty
(Against Jerry Moyes)

76.     The NHL repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

77.     As a member of the NHL joint venture, the Coyotes owe a fiduciary duty to the NHL and its Member Clubs.

78.     Moyes caused the Coyotes to violate its fiduciary duty by the acts complained of above, including but not limited to:  by secretly negotiating with Balsillie and his agents for the sale of the Coyotes in violation of the NHL Constitution and Bylaws; by having his representative lie to the NHL Commissioner about the status of any pending discussions to sell the Club, by directing the Coyotes and its affiliated holding companies to file bankruptcy; by agreeing to a purported sale and relocation of the Coyotes without notifying or seeking the approval of the NHL; and by suing the NHL to invalidate the transfer restrictions contained in the Consent Agreement, and in the NHL Constitution and Bylaws.

79.     The Coyotes' breaches have caused substantial injury to the NHL.

80.     Jerry Moyes provided knowing and substantial assistance to, and directed and caused, the Coyotes' breaches of its fiduciary duties.

81.     As a direct and proximate result of the Coyotes' breaches of fiduciary duties, the NHL has been damaged in an amount to be determined at trial, but not less than $10 million.

82.     Jerry Moyes acted maliciously in aiding and abetting the Coyotes' breach of fiduciary duties by acting deliberately with knowledge of the NHL's rights and with an intent to interfere with those rights.

- 21 -

83.     Punitive damages in an amount to be determined at trial are warranted to punish Jerry Moyes for his malicious conduct.

### COUNT IV

### Breach Of the Guaranty
### (Against All Defendants)

84.     The NHL repeats and realleges the allegations in paragraphs 1 through 83 as if fully set forth here.

85.     The Moyes Parties entered a Guaranty on September 27, 2006, pursuant to which the Moyes Parties agreed to pay to the NHL, on demand, certain Guaranteed Obligations.

86.     The Guaranteed Obligations include, among other things, the obligation of the Moyes Parties to provide to the Coyotes at all times sufficient funds to maintain $10 million of Net Working Capital, and to guarantee the full and punctual payment of all debts, obligations and liabilities of the Coyotes, including any such liabilities to the NHL.

87.     The liability of the Moyes Parties under the Guaranty is capped at $15 million, except for certain obligations that are not included in the cap.

88.     There are presently due Guaranteed Obligations owed to the NHL in the amount of $11.6 million.

89.     The Moyes Parties agreed that their liability under the Guaranty is effective immediately and shall be payable on demand by the NHL.

90.     The Moyes Parties have stated that they do not intend to pay the $11.6 million owed under the Guaranty.

91.     The Moyes Parties have not paid the $11.6 million they owe under the Guaranty.

- 22 -

92.     In Section 3 of the Guaranty, the Moyes Parties agreed to pay, on demand, all reasonable costs and expenses, including attorney' fees, incurred or expended by the NHL in connection with the Guaranteed Obligations.

## COUNT V

### Breach Of the Guaranty – Gretzky Obligations
### (Against All Defendants)

93.     The NHL repeats and realleges the allegations in paragraphs 1 through 92 as if fully set forth here.

94.     If the Coyotes are liable for the Gretzky Obligations, then the NHL has the right to enforce the Gretzky Obligations against the Moyes Parties personally, for the benefit of Gretzky, pursuant to the terms of the Guaranty.

95.     Judgment should be entered in the amount of the Gretzky Obligations against the Moyes Parties in favor of the NHL.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff the National Hockey League prays for relief and judgment as follows:

A.      Awarding damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' breaches of the Consent Agreement, including interest thereon;

B.      Awarding damages in favor of Plaintiff against Defendant Jerry Moyes, for aiding and abetting a breach of fiduciary duty, in an amount to be proven at trial, including interest thereon;

- 23 -

C.   Awarding punitive damages in favor of Plaintiff against Defendant Jerry Moyes as punishment for his malicious conduct in aiding and abetting the Coyotes' breach of fiduciary duties, in an amount to be determined at trial;

D.   Awarding damages in favor of Plaintiff against all Defendants, jointly and severally, for the $11.6 million due and owing under the terms of the Guaranty, including interest thereon;

E.   Awarding damages in favor of Plaintiff against all Defendants, jointly and severally, in the amount of the Gretzky Obligations, including interest thereon;

F.   Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.   Granting such other and further relief as the Court may deem just and proper.

Dated:       March 5, 2010

Bradley I. Ruskin
Scott A. Eggers
David S. Mordkoff
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
Phone:  (212) 969-3000
Fax:  (212) 969-2900
bruskin@proskauer.com
seggers@proskauer.com
dmordkoff@proskauer.com

*Attorneys for Plaintiff National Hockey League*

- 24 -

| INDEX NUMBER | 2010 |
|---|---|

**SUPREME COURT OF THE STATE OF NEW YORK / COUNTY OF NEW YORK**

NATIONAL HOCKEY LEAGUE

v.

**JERRY MOYES, VICKIE MOYES, AND THE JERRY AND VICKIE MOYES FAMILY TRUST**

**COMPLAINT**

Pros\auer»
Attorneys for Plaintiff,
1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000

All communications should be referred to:
   Bradley I. Ruskin, Esq.
   Scott A. Eggers, Esq.
   David S. Mordkoff, Esq.

Dated, New York    March 5, 2010

Due service of a copy of the within     is hereby admitted
To
Attorneys for

---

*Sir:*

*Please take notice that the within is a true copy of*
*this day duly entered and filed herein in the*
*office of the clerk of .................................*
*of New York*
Dated, New York     20

Yours, etc.,

Pros\auer»
Attorneys for
1585 Broadway
New York, NY 10036-8299
To

Attorneys for

---

*Sir:*

*Please take notice that an order of*
*which the within is a true copy will be pre-*
*sented for settlement and signature herein*
*to*
*this Court at     of*
*in the Borough of*

City of New York,
on the     day of     , 20
at     o'clock in the     noon.
Dated, New York,     20

Yours, etc.,

Pros\auer»
Attorneys for
1585 Broadway
New York, NY 10036-8299
To

Attorneys for