IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

MINUTE ENTRY/ORDER

FOR MATTER TAKEN UNDER ADVISEMENT

Bankruptcy Judge:   Hon. Redfield T. Baum

Case Name:      Dewey Ranch Hockey, LLC            Ch 7

Case No.:       2:09-bk–09488-RTB

Adversary No.:    2:11-ap-00425

Subject of Ruling:   Bankruptcy Court's Section 157 Report and Recommendation
              Including Proposed Conclusions of Law

Date Ruled Upon:   January 21, 2015

_____

     The  Bankruptcy  Court submits its  report and recommendation, pursuant to 11 U.S.C.

157,  to the District Court, including this court's proposed conclusions of law.  The District Court

referred  this adversary proceeding  to this court  by its  order of  September 15, 2010,  because

this court presided over the related bankruptcy cases.   For reasons unclear to this court, this

adversary proceeding  was not docketed or otherwise received by this  court until  March 2011.

     While this case was pending before this court, the extent of this court's jurisdiction

became  uncertain  when    the U.S. Supreme Court issued its decision in Stern v. Marshall, 564

U.S. ___  ,  131  S.  Ct.  2594,  180 L.Ed.2d 475   (2011).  Thereafter in 2014, the U.S.

1

Supreme Court issued its decision in Executive Benefits Insur. Agency v. Arkison, ___ U.S. ___ , 134 S. Ct. 2165, ___ L.Ed.2d ___ (2014), which opinion clarified the jurisdiction of bankruptcy courts. This court on multiple occasions discussed with all counsel, the effect of these decisions on this court's jurisdiction and the parties filed memorandums thereon. Based upon all of the foregoing, the court concludes that these claims are "Stern claims," Executive Benefits, supra. , requiring this court to submit proposed conclusions of law in a report and recommendation to the District Court.

## 1. THE PLAINTIFF'S CLAIMS

In 2010, the Plaintiff, the National Hockey League ("NHL") sued the Defendants, Jerry and Vickey Moyes, and their family trust (collectively "Moyes") in New York state court for damages resulting from the alleged breaches of the Consent Agreement and Guaranty (the "Agreements") between the Moyes and the NHL. The Moyes executed those Agreements when they acquired the controlling interest in the Phoenix Coyotes ("Coyotes"), one of the NHL's hockey teams. The NHL claims four categories of damages under the Agreements: (1) the operating losses incurred by the NHL since buying the team out of bankruptcy, (2) its attorney's fees and expenses incurred in the bankruptcy case and in trying to sell the team, and matters related thereto, (3) the amount the NHL paid to or for the unsecured creditors in the bankruptcy case, and (4) the amounts owed to Wayne Gretzky ("Gretzky") and not paid by the Coyotes.

## 2. THE MATERIALS FACTS

The material facts are undisputed; the conclusions to be drawn therefrom are hotly contested. In 2006, Moyes became the controlling owner of the Coyotes and the entities that owned and operated both the team and the newly constructed hockey arena in Glendale, Arizona.

As required by the NHL as a condition of that ownership,  Moyes executed the Agreements whereby they agreed that they, the  Coyotes,  and the owning/operating entities would perform all of their obligations as a NHL hockey team.  Those agreements also provided that  (1) the Coyotes home territory was Arizona were it must play its home games and  (2) any transfer of Moyes ownership interest or relocation of the Coyotes  must comply with the NHL's procedures  for such transfer or  relocation.[1]

In 2008, Moyes informed the NHL  that they could no longer fund the operating losses of the Coyotes and as a result thereof the parties agreed that (1)  they would both seek to find a buyer/new owner for the Coyotes  and (2) the NHL would finance the Coyotes' losses until the anticipated sale.  Thereafter, these parties had periodic  meetings  and communications regarding these matters.  In early 2009, the NHL was informed that  Moyes was discussing a possible sale with James Balsillie and his entity PSE (collectively "Balsillie") that would involve a  relocation of the Coyotes to Hamilton, Ontario, Canada.   Balsillie and the NHL were well known by each other because they had previously negotiated about sales of other NHL teams and Balsillie's ultimate goal of owning  a  NHL team located in Hamilton.  The NHL told Moyes to stop negotiating with Balsillie and that there would be no move of the Coyotes.

In 2009, Moyes caused the entities that owned the  Coyotes and managed the arena  to file chapter 11 bankruptcy cases.  Simultaneously Moyes and Balsille executed  an agreement for the sale of the Coyotes  and the team's  relocation to Hamilton.   Moyes  immediately  sought court

---

[1]City of San Jose v. Comm'r of Baseball, ___ F.3d ___(9th Cir. 2015).

authorization to sell the hockey team to Balsillie and to allow the team to move to Hamilton, where it would play its home games. The NHL and the City of Glendale, Arizona [which had built the new hockey arena specifically for the Coyotes who had agreed to a long term use, management, and lease of that arena as its home field,] both objected to the proposed sale and move of the team. Those cases resulted in significant litigation. Ultimately the requested sale to Balsillie and proposed move of the team was not approved. During that same sale process, the NHL submitted its initial bid to purchase the team. Unlike Balsillie's bid, the NHL's initial bid was denied without prejudice. In so ruling, this court encouraged the NHL to submit an approvable offer to purchase the Coyotes. See: In re Dewey Ranch Hockey, LLC., 406 B.R. 30 (Bankr. Az. 2009); In re Dewey Ranch Hockey, LLC., 414 B.R. 577 (Bankr. Az. 2009).

The NHL's initial bid proposed to pay in full all of the Coyotes' creditors except Moyes and Gretzky. The NHL presented undisputed evidence and represented that it was very important to the NHL and its business interests that the legitimate creditors of the Coyotes be paid. The court did not approve that bid because it violated "one of the prime policies of bankruptcy" of "equality of distribution amongst creditors"; noting that there had been no determination that Moyes and Gretzky were not creditors. Shortly after that decision and as a result of the status hearing on October 26, 2009, the NHL's purchase of the team was accomplished by a Stipulated Sale Order Approving Amended and Clarified Bid (the "Sales Order"), stipulated to by all of the main parties, and pursuant to that Sale Order the parties were authorized to and did executed a detailed Asset Purchase Agreement ("APA") . The NHL promptly closed on the court approved sale of the Coyotes.

4

### 3.   THE BANKRUPTCY COURT'S OCTOBER 4, 2013 DECISION IN THIS ACTION

On October 4, 2013, this court issued its decision in this action on the parties' cross motions for summary or partial summary judgment.   That decision is incorporated herein by reference and attached hereto for ease of reference.  As more fully set forth therein,  the court granted the Defendants' motion for summary judgment on the Plaintiff/NHL's claims to recover (1) the  operating losses incurred by the NHL or its affiliates, (2) on the NHL's  aiding and abetting claim for breach of fiduciary duty, and (3) the   amounts owed to  Gretzky by the Coyotes.

### 4.   THE REMAINING CLAIMS BY THE NHL

Pending before the court are the two unresolved claims for damages by the NHL. Specifically, (1) the NHL's claim for attorney's fees and expenses it incurred in the bankruptcy case and in its efforts to sell the Coyotes and (2) the NHL's claim to recover the amounts the NHL paid to or for the claims of  the unsecured creditors in the Coyotes'  bankruptcy cases.

### A.  THE NHL'S CLAIM TO RECOVER THE AMOUNTS PAID  TO THE UNSECURED CREDITORS

Considering first,  the NHL's claim against Moyes to recover the amounts the NHL paid to the unsecured creditors, the NHL relies on the express terms of the Sale Order to support its claim that the NHL acquired those claims by assignment and the obligations represented thereby remain outstanding; and,  therefore, the Moyes  are liable for those amounts. Under the terms of   their  Agreements,   the NHL asserts that the  Moyes are, and always were,  liable  for the payment of these debts.  The Sale Order expressly provided that "Buyers' purchase of the Unsecured Liabilities does not extinguish the claims underlying the Unsecured Liabilities" and "Buyers will use their commercially reasonable efforts to purchase approximately $11.6 million, representing substantially all (by number), of Seller's

5

prepetition unsecured claims".  If that was all there was to consider, the court would recommend that the NHL be granted summary judgment on this issue.  But there is much more.

In analyzing this claim and the defense, it is important to set forth  the changed circumstance when the Sales Order was entered. The  procedural status and  circumstances  were  materially different from when the September 2009 decision was entered.  Everyone agreed that the team needed to be sold quickly and the NHL was the only available buyer.  One of the significant differences was that almost all of  the main parties stipulated to the sale of the Coyotes to the NHL and approved the terms of  Sale Order.   The primary objector to the NHL's initial offer,  Moyes,  now consented to the sale.  Gretzky was given every opportunity to object to the NHL's  offer and did not object.  For the prior year, the NHL and Moyes had unsuccessfully searched for a buyer.  The NHL was funding the Coyotes' operating losses. That funding effectively  reduced the available funds for the general creditors.  Simply stated,  the proposed sale to the NHL was the only solution to the Coyotes'  legal  and financial problems.  From the court's perspective,  the  sale paid all the creditors in full except Moyes, who consent to the sale, and Gretzky, who made no objection to the sale. Therefore,   because of the virtual unanimity of the main parties and no objection by any party,  the sale was approved by the court and the Sales Order was entered.

The court does not agree with two of the  assertions by the NHL in support of its motion.  First and contrary to the NHL's assertion, there is an ambiguity and inconsistency between the Sales Order and this court's September 2009 decision.   The September 2009 decision denied approval of the NHL's bid because it treated similar creditors,  some of whom objected to such sale,  dramatically different contrary to the terms of the Bankruptcy Code .  The Sales Order effectively  treated those creditors exactly as the prior and unapproved NHL bid;  namely all creditors were paid in full except Moyes and Gretzky.  Second,  the Sales Order did allow the NHL to control the sale proceeds,  contrary to the NHL's assertion that it did not "control the sales proceeds".  The treatment of the creditors under the

6

Sales Order was identical to the treatment under the NHL's prior/initial bid.  The NHL controlled the sale proceeds because it did not want any of the sales proceeds paid to either Moyes or Gretzky.

The essence of Moyes' defense is that the unsecured debts of the Coyotes were paid when the NHL purchased the team pursuant to the Sales Order and, therefore, there are no unpaid debts of the Coyotes to support the NHL's claim.  Of course and as more fully discussed above, the terms of the Sales Order stated that the claims were assigned, not paid, and that the claims were not extinguished. Moyes stipulated to the entry of the Sales Order and generally stipulations are binding. See:  In re Springpark Asoc., 623 F.2d 1377 (9th Cir. 19988) cert. denied 449 U.S. 956 , 101 S. Ct. 364, 66 L.Ed.2d 221 (1990;  In re Herra, 23 B.R. 796 (9th Cir. B.A.P. 1982). .  However, the Sales Order expressly provided that the stipulating parties "reserve their respective rights" ("The NHL, on the one hand, and " [Moyes] "on the other hand, expressly reserve their respective rights to assert any claims, actions, causes of action and defenses they may have with respect to the Moyes Guaranty"). [Sales Order Paragraph M] Their agreement about reserving their rights was also confirmed on the record at the October 26, 2009 hearing so as to allow the sale of the team to the NHL to promptly occur.  A reservations of rights generally means "all rights" are preserved.   See: A.R.S. 47-1207. Thus, because Moyes reserved thier rights they are not precluded from their defense that the debts have been paid notwithstanding the above referenced terms of the Sale Order.

Throughout the sales proceedings before this court, the NHL's testimony and representations were that its purchase and bid for the Coyotes would pay all the legitimate creditors in full.  Those statements and representations were never expressly withdrawn by the NHL.  Just prior to the entry of the Sales Order, the NHL, though its attorneys, told the court that the NHL would change the form but not the substance of its offer. Namely that it would try to acquire the unsecured claims by assignment and that the acquired claims would not be extinguished by that assignment.  Furthermore and as asserted by Moyes, the Sales Order required the NHL to pay the bankruptcy estate the difference between the total

7

amount of the unsecured claims less the amount of claims assigned to the NHL.  These facts support

Moyes' assertion that these debts have been paid.

Such a conclusion is further supported by a recent statement and  admission  by the NHL

acknowledging that the claims have, in fact, been paid.  Specifically, in its memorandum in opposition  to

the Moyes' current motion for partial summary judgment on its attorney's fees claim, the NHL stated

"Finally on this point, a portion of the Fees and Expenses incurred by the NHL in connection with the

Coyotes bankruptcy proceeding related to the NHL's efforts to ensure that the Coyotes' creditors were

paid".(Dk 215, page 13).  See:  Fidelity & Deposit Co. of Maryland v. Hudson United Bank, 653 F.2d

766 (3rd Cir. 1981); U.S. v. One Heckler Koch Rifle, 629 F.2d 1250 (7th Cir. 1080).

Finally, the court concludes that the NHL is judicially estopped from asserting that the claims

have not been paid.  As set forth in its earlier decision,  there are three requirements that must be met to

apply the doctrine of judicial estoppel.  First, a party's later position must be clearly inconsistent with its

earlier position.  Here the NHL by both its evidence and representations  told this court that its bid would

pay the legitimate unsecured creditors in full and that it was important to the commercial and business

interests of the NHL that these debts by paid. Procedurally there was only one motion and sales

proceeding before the bankruptcy court and these statements and representations were made during that

proceeding.   Now it claims that these debts were not paid. These positions by the NHL are

fundamentally inconsistent.   Second, the party succeeded in persuading a court to accept that party's

earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create

the perception that either the first or second court was misled. It was very important to the NHL to be

able to say to the hockey/business community that the vendors and suppliers of the Coyotes had been

paid.  This court accepted the NHL's position that the "legitimate" unsecured creditors were paid.

Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or

impose an unfair detriment on the opposing party if not estopped.   The court concludes that both

8

requirements are present here;   if the court adopted the NHL's inconsistent positions  the NHL would gain an unfair advantage by  announcing  that it caused the legitimate creditors to be paid  while seeking a judgment against Moyes for the same unpaid debts; similarly that would impose an unfair detriment on Moyes.   Accordingly, this court concludes that the NHL is judicially estopped  from claiming that the unsecured creditors have not been paid from the sales proceeds.

Therefore, this court recommends that the District Court grant  Moyes' motion for summary judgment on this issue.

## B.    THE NHL'S CLAIM TO RECOVER ITS ATTORNEY'S FEES AND EXPENSES

The NHL seeks to recover from Moyes the attorney's fees and expenses  it incurred in connection with the Coyotes' bankruptcy case and matters related thereto, particularly the efforts to sell and the ultimate sale of the Coyotes.   Moyes in its opposition to that claim divided the attorney's fees into seven categories and, for purposes of these motions, the NHL does not contested that breakdown. Unfortunately and as more fully set forth below, that allocation of  fees and expenses  does not aid in the resolution of this claim.

Moyes defends  against this claim asserting that these claims are barred by the bankruptcy preemption  doctrine and  because these claimed damages were not foreseeable.   Moyes' unforeseeable argument is easily resolved  by this court.  Because multiple NHL teams had filed bankruptcy  cases prior to the Coyotes'  case, it was not unforeseeable by these parties when they entered into these Agreements that the Coyotes might file a bankruptcy case causing the NHL to incur attorney's fees and expenses. Hence,  when the Agreements were entered into Moyes  could foresee that the NHL might  incur attorney's fees and expenses if they  caused the Coyotes to file a bankruptcy proceeding. Hence, the not foreseeable defense fails.

As in its earlier decision, this court finds it difficult to determine  the precise  extent and scope of the attorney's fees and expenses  claimed by the NHL which are preempted.  Neither the cases cited by

the parties nor this court's own research produced any case authority similar to the situation here to guide

this court, i.e.,   the extent of the bankruptcy preemption doctrine as applied to  the rights and claims of

a major creditor in the bankruptcy case on that creditor's right to pursue its breach of contract claims

against a non-bankrupt party.

The centerpiece of any preemption analysis is congressional purpose.  The purpose of Congress

is the ultimate touchstone.  Retail Clerks Int'l Ass'n  v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11

L.Ed.2d 179  (1963);  Pacific Gas and Elec. Co. California, 350 F.3d 932 (9th Cir. 2003).  Any

understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of

congressional purpose.  Medtronic, Inc., v. Lohr, 518 U.S. 470, 116 S.Ct. 2240,  135 L.Ed.2d 700 (1996);

Pacific Gas, supra.  Congress' purpose in enacting the Bankruptcy Code is well stated in MSR

Exploration, 74 F.3d at 913-914, which was resolving a bankruptcy preemption claim:

> "Congress has expressed its intent that bankruptcy matters be handled in a federal forum by
> placing bankruptcy jurisdiction exclusively in the district courts as an initial matter… .  Thus,
> the exclusivity of federal jurisdiction over bankruptcy matters is an indication of Congress's
> intent.  Second,  … the complex, detailed, and comprehensive provisions of the lengthy
> Bankruptcy Code demonstrate Congress's intent to create a whole system under federal control
> which is designed to bring together and adjust all of the rights and duties of creditors and
> embarrassed debtors alike.  …  the adjustment of rights and duties within the bankruptcy process
> itself is uniquely and exclusively federal … .  In short, the highly complex laws needed to
> constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore
> the need to jealously guard the bankruptcy process from even slight incursions and disruptions
> brought by state malicious prosecution actions."

Based upon all of these authorities,  the court now concludes that the bankruptcy  preemption

doctrine extends to all rights and claims that are either expressly provided for in the Bankruptcy Code or

are so fundamental to a bankruptcy case as to be impliedly included within the bankruptcy  process.

Throughout the Coyotes' bankruptcy proceedings, the NHL  appeared and participated in

multiple capacities.  Specifically, the NHL asserted its rights as a secured creditor,  d.i.p.  lender (funded

the debtors' operations during the bankruptcy proceedings),  bidder, buyer, adversary defendant, and

10

party to executory contracts with the bankrupt debtors.  In its prior ruling this court concluded that certain attorney's fees and expenses incurred by the NHL were barred by the preemption doctrine. These would include fees and expenses of the NHL in its capacity as a secured creditor, the d.i.p. lender, and defendant in the antitrust adversary proceedings.  Which attorney's fees and expenses could and should have been claimed as part of the bankruptcy case.

Based upon this court's conclusion about the extent of the bankruptcy preemption doctrine, most of the attorney's fees and expenses incurred by the NHL during the bankruptcy cases are preempted and not recoverable from Moyes.  Pursuant to Section 365 of the Bankruptcy Code, the NHL could have claimed and recovered its then attorney's fees and expenses in connection with the assumption and assignment of the Coyotes' contracts. [See Article 3.5 NHL Constitution and Paragraph 3 of the Guaranty.]  The Sales Order expressly provided that the NHL acquired all of the debtors rights under the "Assumed Contracts" in accordance with Section 365 of the Bankruptcy Code .   To assume any contract under Section 365 the debtor must, among other requirements, cure any default(s) plus compensate the other party to that contract, here the NHL, for any "actual pecuniary loss" caused by its default.  The Sales Order expressly   dealt with this requirement to cure any defaults and pay any actual pecuniary loss ["The payment of the applicable Cure Costs (if any) shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtor constitute adequate assurance of future performance thereof.  The non-Debtor party or parties to each Assumed Contract , upon receipt of their Cure Costs, if any, are enjoined and forever barred from asserting against the Buyers, any of their affiliates or any of the Assets; (I) any fee, default, breach, claim or pecuniary loss arising by reason of the Closing, and (ii) any objection to the assumption and assignment of such non-Debtor party's Assumed Contract." (Sales Order page 15 line 27 to page 16 line 7].  The NHL's position throughout this action and during the bankruptcy case has been that the Coyotes

11

and Moyes were in default of multiple obligations since prior to the filing of the bankruptcy cases. Thus in the bankruptcy case, the NHL was entitled to recover all of its reasonable   attorney's  fees and expenses as a condition of  the assumption of the bundle of contract rights  acquired by the NHL. For whatever reason, the NHL never made any claim for those attorney's  fees and expenses in connection with  its purchaser of the Coyotes, which purchase included an assignment and assumption of virtually all of the debtors' executory contracts.  The NHL claimed other amounts due it  in connection with that purchase.  (see:  APA- Schedule 2.6(v) T Team  Allowable  Unsecured Claims #(s) 70, 72 & 73.) That sale closed  on November 2, 2009 (BK Docket 1083).  Therefore, all attorney's fees and expenses incurred prior to November 2, 2009 should have been claimed by the NHL as a condition of the assignment and  assumption of the Coyotes' executory contracts by the NHL and are now barred by the bankruptcy preemption doctrine.

Finally the court concludes that the judicial estoppel doctrine precludes the NHL's claim for its attorney's fees and expenses incurred by it prior to November 2, 2009.  As set forth above, the NHL  did not claim these expenses as cure costs or actual pecuniary losses when it purchased the team.  Now the NHL asserts an inconsistent position by claiming such amounts.  The NHL prevailed on its initial position by its purchase of the team pursuant to the Sales Order.  At a minimum, the sale proceeds would have allowed at least a  partial payment on these amounts  if the NHL had made a claim for them.  Lastly, the NHL would gain an unfair advantage by its current claim if allowed and there would be a corresponding and , unfair detriment to Moyes,  if they were ordered to pay these expenses which should have been claimed in the bankruptcy case.  Accordingly, the NHL  is also judicially estopped from now pursuing this claim.

However, the attorney's fees and expenses incurred by the NHL after November 2, 2009 were not within the cure rights or  actual pecuniary loss rights of the NHL recoverable under Section 365.

12

Therefore  these amounts were not so barred and were foreseeable,  and so such amounts may be recoverable by the NHL.  During these proceeding before this court, the NHL did acknowledge that its recoverable attorney's fees and expenses must be reasonable and, therefore, may be capped by that requirement.   The NHL has demanded a jury trial on this portion of its remaining attorney's fees and expenses claim and has not consented to such jury trial before this court.  11 U.S.C. 157(e).  Absent such "express consent" only the District Court can conduct that jury trial.

## 5.    CONCLUSION AND PROPOSED CONCLUSIONS OF LAW

This Bankruptcy Court now submits this decision as its  Section 157 Report and Recommendation to the District Court. Because the material facts are undisputed, this court is not submitting any proposed findings of fact.  Specifically, the following are the Bankruptcy Court's proposed conclusions of law:

1. The bankruptcy preemption doctrine precludes the NHL from recovering any of its attorney's fees and expenses incurred prior to November 2, 2009.

2. Under the Agreements,  the NHL is entitled to recover its attorney's fees and costs incurred after November 2, 2009.

3. The NHL paid the unsecured creditors at or prior to the November 2, 2009 closing and, therefore, there are no unpaid debts of the Coyotes to support the NHL's claim against Moyes under the Agreements.

4. Based upon the uncontested evidence and representations  before the bankruptcy court, the NHL is judicially estopped from claiming that the unsecured debts have not been paid.

5. The NHL's claim against Moyes for the unpaid amounts owed Gretzky are barred by the doctrine of judicial estoppel.

6. The NHL's claims for its post acquisition losses are not recoverable because the losses were not foreseeable when the contracts were made and the express terms of the Agreements do not apply to those losses.

7. The bankruptcy preemption doctrine precludes the NHL's claim for damages for aiding and abetting a breach of fiduciary duty.

13

Therefore and based upon these legal conclusions,  this court recommends that the District  Court grant Moyes' motions for summary judgment on all of the NHL's claim's except for its claim for attorney's fees and expenses incurred after November 2, 2009, which claim must be tried to a jury, pursuant to the NHL's demand for a jury trial.

14

Copy mailed/emailed January 21, 2015 to:

David Mordkoff
Bradley Ruskin
Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
dmordkoff@proskauer.com
bruskin@proskauer.com

Alan Meda
Burch & Cracchiolo PA
702 E. Osborn Rd. Suite 200
Phoenix, AZ 85004
ameda@bcattorneys.com

Thomas Salerno
Gordon Silver
1 E. Washington St.  #400
Phoenix, AZ 85004
tsalerno@gordonsilver.com

Stephen Susman
Susman Godfrey LLP
350 Lexington Ave. 15th Floor
New York, NY 10022
ssusman@susmangodfrey.com

Oleg Elkhunovich
Susman Godfrey LLP
2901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067

oelkhunovich@susmangodfrey.com

Hon. G. Murray Snow
Sandra Day O'Connor
United States Courthouse
401 W. Washington St. Suite 622
Phoenix, AZ 85003

By:  /s/ Lorraine Davis
      Judicial Assistant

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

MINUTE ENTRY/ORDER

FOR MATTER TAKEN UNDER ADVISEMENT

Bankruptcy Judge:      Hon. Redfield T. Baum, Sr.

Case Name:             Dewey Ranch Hockey, LLC.          Ch 7

Case No.:              2:09-bk-09488 - RTB

Adversary No.:         2:11-ap-00425 - RTB

Subject of Ruling:     Motions for Summary Judgment

Date Taken
Under Advisement:      July 11, 2013

Date Ruled Upon:       October 4, 2013
_____

In this removed adversary proceeding, pending before the court are cross motions for summary or partial summary judgment. The material facts are largely undisputed and are set forth in the parties Proposed Final Pretrial Order.

The Plaintiff, the National Hockey League ("NHL") in March 2010 sued the Defendants, Jerry and Vickie Moyes plus their family trust (collectively "Moyes") in state court in New York for damages resulting from the alleged breaches of the Consent Agreement and Guaranty executed on September 27, 2006 by the Moyes for the benefit of the NHL.

1

These agreements were made when the Moyes acquired the controlling interest in the NHL's member team/"franchise," the Phoenix Coyotes ("Coyotes").

The NHL alleged claims for multiple breaches of the agreements and for aiding and abetting a breach of fiduciary duty. In the parties' Proposed Final Pretrial Order, the NHL claims four categories of damages it suffered as a result of the claimed breaches. First, the amounts advanced by the NHL for the operating losses of the Coyotes since the NHL purchased the team in November 2009, approximately $112,708,322.00[1]. Second the attorney's fees and expenses of the NHL primarily incurred by it in the bankruptcy proceeding and in attempting to sell the Coyotes, approximately $15,082,803.00. Third, the amount paid by the NHL to the unsecured creditors in the bankruptcy case, approximately $11,617,879.00. Fourth, the NHL seeks to recover under the agreements, for the benefit of Wayne Gretzky ("Gretzky"), the unpaid amounts due Gretzky by the Coyotes, approximately $6,514,299.00.

## THE BANKRUPTCY PREEMPTION DOCTRINE
## PRECLUDES MANY OF THE NHL'S CLAIMS

The Moyes primary defense to the NHL's claims is that such claims and claimed damages are all preempted under the theory of bankruptcy preemption, i.e., all of the acts alleged by the NHL occurred in the Coyotes chapter 11 bankruptcy case and therefore the NHL's alleged state law claims are preempted.

The preemption doctrine has its roots in the Supremacy Clause of the United States Constitution and is implicated only when there is a conflict between federal and state regulation.

---

[1] After the oral argument on these motions, the NHL sold the Coyotes and thereafter filed a supplemental memorandum and declaration acknowledging that these damages had been "reduced" and that it would later supplement its expert report "to reflect the precise amount of its damages".

2

MSR Exploration v. Meridian Oil, 74 F.3d 910 (9th Cir. 1996).  Under this doctrine, state laws

interfering with, or contrary to federal law are preempted.  Perez v. Campbell, 402 U.S. 637, 91

S. Ct. 1704 (1971). The rationale for applying bankruptcy preemption to preclude subsequent

claims in state court for actions in bankruptcy cases is set forth in  MSR Exploration 74 F.3d at

913-914:

> Congress has expressed its intent that bankruptcy matters be handled in a federal forum
> by placing bankruptcy jurisdiction exclusively in the district courts as an initial matter...
> Thus, the exclusivity of federal jurisdiction over bankruptcy matters is an indication of
> Congress's intent.  Second, ...the complex, detailed, and comprehensive provisions of the
> lengthy Bankruptcy Code demonstrate Congress's intent to create a whole system under
> federal control which is designed to bring together and adjust all of the rights and duties
> of creditors and embarrassed debtors alike.  ...the adjustment of rights and duties within
> the bankruptcy process itself is uniquely and exclusively federal...  In short, the highly
> complex laws needed to constitute the bankruptcy courts and regulate the rights of
> debtors and creditors also underscore the need to jealously guard the bankruptcy process
> from even slight incursions and disruptions bought about by state malicious prosecution
> actions.

In MSR Exploration, the court found that the subsequently filed state court malicious

prosecution action for filing and pursuing claims in the prior Chapter 11 bankruptcy case was

completely preempted by the bankruptcy case. The Ninth Circuit has also held that a prior

bankruptcy case

preempted actions and claims for (1) damages for the filing and prosecuting involuntary

bankruptcy petitions against the plaintiff's relatives, In re Miles, 430 F.3d 1083 (9th Cir. 2005);

(2) attorneys fees in a bankruptcy case were governed by Section 506(b) of the Bankruptcy Code

which preempts state law governing attorney's fees, Matter of 268, Ltd., 789 F.2d 674 (9th Cir.

1986); (3) preferential transfer claims authorized by state law are completely preempted by the

Bankruptcy Code, Sherwood Partners, Inc., v. Lycos Inc., 394 F.3d 1198 (9th Cir. 2005); (4) the

filing of a proof of claim in a bankruptcy case which might otherwise be the subject of  liability

3

for violation of state and federal fair debt collection laws, <u>In re Chaussee</u>, 399 B.R. 225 (9th Cir. B.A.P. 2008);   Further, the Ninth Circuit recently held that the anti-assignment provisions contained in various insurance contracts/policies, enforceable under California (state)  law, which provisions stood as an obstacle to completion of a successful Section 524(g) plan of reorganization were preempted by federal bankruptcy law.  <u>In re Thorpe Insulation Co.</u>, 677 F.3d 869 (9th Cir. 2012).   Also, the Second Circuit has held that state actions for alleged violation of the automatic stay in bankruptcy are completely preempted by the prior bankruptcy case. <u>Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank</u>, 236 F.3d 117 (2nd Cir. 2001)

The opinion in <u>Astor Holdings, Inc. v. Roski</u>, 325 F. Supp. 2d 251 (S.D.N.Y. 2003) may be the most analogous to this case.  There the court granted summary judgment on the aiding and abetting breach of fiduciary duty claim. In so doing, that court concluded that under the federal bankruptcy  preemption doctrine, no authorized proceeding in bankruptcy can be questioned in a state court or used as a basis for the assertion of a tort claim in state court against any defendant. Citing the <u>Eastern Equipment </u>opinion, that court noted the broad scope of bankruptcy preemption which "relate to all aspects of the bankruptcy proceeding".  325 F. Supp.2d at 261. Further, that court stated  that the "areas where preemption does not apply are extremely limited" and that the fact that the particular defendant in the state law suit was not the bankruptcy debtor is a distinction without a difference since preemption entails that a claim could have been made and for which a remedy is provided, under the Bankruptcy Code,  cannot be the subject of regulation by state statutory or common-law remedies.  325 F.Supp.2d at 261, 262.

The NHL claims that the Moyes breached their agreements by "engaging in negotiations with Balsillie, "keeping them (the negotiations) secret from the League, "agreeing to sell the

4

Coyotes and to relocate the Club without NHL consent", and suing the NHL for antitrust claims in breach of "the prohibition against challenging the NHL Constitution and Agreements". With very minor exceptions, all of these actions by the Moyes occurred in, or in connection with, the Coyotes' bankruptcy case. To paraphrase the foregoing authorities regarding the bankruptcy preemption doctrine, no authorized proceeding in bankruptcy can be questioned in state court or used as a basis for a tort claim in state court. That is precisely what the NHL is doing by most of the claims it is asserting in this litigation. Therefore, any claims by the NHL based upon negotiations, failing to disclose such negotiations, agreeing to sell and relocate the Coyotes through the bankruptcy process, and the filing of the antitrust adversary action in the bankruptcy court are all barred by the bankruptcy preemption doctrine.

The court struggles with the application of the matters preempted beyond the foregoing because of the disconnect the court sees between the actions the NHL uses to support its claims and the damages claimed by the NHL. The NHL asserts that the Moyes negotiations, concealment thereof, and the agreement to sell and relocate establish breaches claimed by the NHL. However, other than arguably the Getzky claim, all of the damages claimed by the NHL result from either its purchase of the hockey team or its attorney's fees plus expenses in the bankruptcy case. At a minimum, some of such claimed damages may also be preempted. Because the court has concluded, as more fully set forth below, that for other reasons the NHL is precluded from pursuing some of these claims for such damages, the court does not need to decide, beyond what is decided above, the breadth of the preemption of the NHL's claimed damages.

5

**THE NHL IS BARRED BY JUDICIAL ESTOPPEL FROM RECOVERING FROM MOYES THE AMOUNT STILL OWED ON THE GRETZKY CLAIM**

The NHL asserts that is has the right under the agreements to recover from Moyes the remaining unpaid amounts, approximately 6.5 million dollars, still owed to Gretzky. In the bankruptcy case, the NHL's original bid to buy the Coyotes required that the sale proceeds could be used to pay almost all of the unsecured creditors other than Gretzky and Moyes. The NHL asserted that it was taking this position because it was in the NHL's commercial interest to do so and to maintain the good will of the team. NHL Commissioner Bettman stated in his declaration that "the bid is structured to allow payment of all legitimate creditors". This court initially denied the NHL's bid, in part, because of the exclusion of any payment to Gretzky (DK 1017). Thereafter, the court approved the sale of the Coyotes to the NHL. The NHL's terms for the sale to it expressly provided that it would pay all the unsecured creditors in full other than the claims of Gretzky and Moyes.

Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. Courts invoke judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings and to protect against a litigant from playing fast and loose with the courts. Hamilton v. State Farm, 270 F.3d 778 (9th Cir. 2001). There are three factors to be considered in determining to apply the doctrine of judicial estoppel. First, a party's later position must be clearly inconsistent with its earlier position. Second, the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create

6

the perception that either the first or second court was misled.   Third, whether the party seeking

to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment

on the opposing party if not estopped.   New Hampshire v. Maine, 532 U.S. 742, 121 S. Ct. 1808

(2001); Hamilton, supra.

      This court concludes that the three requirements for the application of the doctrine of

judicial estoppel are meet here and therefore the NHL is judicially estopped from pursuing its

claim on the Gretzky debt.  First, the NHL's current position/claim now is fundamentally

contrary to and inconsistent with its earlier position before this court.  Previously, the NHL

claimed that the Gretzky debt was not a legitimate claim/debt and not entitled to share with all

the other unsecured creditors in the sale proceeds from the NHL's purchase of the Coyotes.  This

court struggles  mightily with the NHL's assertion that  there is  no  inconsistency  with its

positions. Second, the NHL ultimately succeeded in persuading this court to accept its earlier

position to exclude Gretzky's debt from receiving any payment when the NHL purchased the

Coyotes pursuant to court order. Third, the NHL would derive an unfair advantage and would

impose an unfair detriment on Moyes if the court does not apply judicial estoppel.  Notably

virtually all the other unsecured creditors were paid in full.  Had the large Gretzky claim been

included in that group it would have received a significant amount to reduce its claim and the

other creditors would correspondingly have received a smaller, partial payment on their claims.

In taking its earlier position, the NHL claimed that it was to its commercial advantage to pay  the

unsecured creditors in full, excluding Gretzky; it appears to this court that by so doing the NHL

(1) did not have to pay the approximately 7 million dollars owed Gretzky, i.e., it saved that

amount and (2) obtained the "commercial advantage" of apparent  full payment to all the other

7

creditors thereby maintaining or being able to claim that the creditors of the NHL/Coyotes got paid-an unfair advantage. More importantly, to now allow the NHL to recover on this claim would impose an unfair detriment on Moyes by making them pay this claim in full; when, at a minimum, the claim would have been substantially reduced had the Gretzky claim been paid from the sale proceeds like all the other unsecured creditors.  It is now, as the NHL asserts, beyond dispute that the Gretzky claim is a valid claim entitled to payment, i.e., an undisputed legitimate claim of the Coyotes contrary to the previous position of the NHL before this court.

### THE NHL'S POST ACQUISITION LOSSES ARE NOT RECOVERABLE BECAUSE THE LOSSES WERE NOT FORESEEABLE WHEN THE CONTRACTS WERE MADE AND THE EXPRESS TERMS OF THE AGREEMENTS DO NOT APPLY TO THOSE LOSSES

Damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed.  Kenford Company, Inc. v. County of Erie, 73 N.Y. 2d 312, 537 N.E.2d 176 (1989); and cases cited therein.  To support its claimed post acquisition operating losses/damages, the NHL points to the many comments and communications by the Moyes or their agents in 2009 to the effect that the NHL would adamantly oppose the proposed sale and relocation of the Coyotes.  Its assertions miss the time requirement of foreseeability  which is that the  damages must be reasonably foreseeable or within the contemplation of the parties at or prior to when the contract is executed, i.e., the correct time period is the negotiations  and the moment when the contract is executed.

Here there is nothing in the voluminous record before this court that even remotely indicates that the parties foresaw or contemplated,  when the contract was executed,  that the NHL would acquire the team from Moyes and thereafter seek to hold Moyes liable for any losses

8

incurred by the NHL resulting from its ownership and subsequent operation of the Coyotes.  It is undisputed that the NHL has never previously purchased or otherwise owned an NHL team prior to its acquisition of the Coyotes.  Therefore, the NHL's claimed operating losses incurred during its ownership of the Coyotes were not foreseeable or contemplated by these parties  and, therefore, are not recoverable.

It appears to the court that there is an additional reason why Moyes are not liable to the NHL for the operating losses and expenses incurred by the NHL since its acquisition and operation of the hockey team.  Both the Consent Agreement and Guaranty by their express terms apply to the four Moyes entities that acquired all of the collective rights in and to the hockey team and either three or all four of these entities were debtors in the bankruptcy cases.[2]

Paragraph 7 of the Consent Agreement required one or more of these entities to timely pay all of the "Operating Expenses" of the hockey operations by these four entities.  Similarly, the Guaranty required and guaranteed the timely payment of the same "Operating Expenses".  The definition of Operating Expenses is telling, "Operating Expenses includes all debts, obligations, liabilities and expenses of the Club including, but not limited to, the following: all obligations incurred by the Club in the operation of the Franchise: ... ."  "Club" is a defined term in the agreements meaning one of the four Moyes entities (specifically Coyotes Hockey); more importantly the term Club, as used in the agreements, is not the NHL, Coyotes Newco, LLC., or any other affiliate of the NHL.  Significantly, these agreements, by their express terms, do not apply to operating expenses incurred by the NHL or Coyotes Newco, LLC, et. al. (the actual

---

[2] There is a discrepancy between one of the names in the agreements and one of the debtors in bankruptcy.  In the Consent Agreement, one of the Moyes' parties is "Coyotes Holdings Member Co, LLC, a Delaware limited liability company" and one of the chapter 11 debtors was "Coyotes Hockey, LLC".  The court suspects that these are the same entities.

9

buyers) in operating the Phoenix hockey team either as the owner(s) or in any other capacity. Because the express terms of the parties' agreements do not provide that the Moyes will pay for the operating expenses after any sale of the operation to a new owner, here the NHL or its affiliate, the Moyes are not liable for the expenses claimed by the NHL

Additionally, that the express terms of the two agreements now at issue before this court do not by their terms apply to the operating losses incurred by the NHL, et. al., and which the NHL seeks to recover from the Moyes is additional and compelling support for the conclusion above that these losses were not foreseeable or contemplated by the parties in 2006 when these agreements were executed.

### SUMMARY JUDGMENT IS NOT APPROPRIATE ON THE NHL'S CLAIM TO RECOVER THE FUNDS IT PAID TO THE UNSECURED CREDITORS

At best for the NHL on its summary judgment motion, there is an ambiguity between the stipulated sale order and this court's order denying the initial sale of the team. The NHL claims that under the Consent Agreement and Guaranty the Moyes are liable for the amounts that the NHL paid to or for the unsecured creditors as part of its purchase of the hockey team.

There is an ambiguity between the court's September 30, 2009 (DK 1017) order denying the NHL's initial bid to buy the team and the stipulated sale order. This court initially denied the NHL's bid, in significant part, because the bid proposed to pay all the "legitimate" unsecured creditors in full excluding Moyes and Gretzky effectively claiming that they were not legitimate creditors, where there had been no determination on the merits of their claims. In that ruling the Court reminded the NHL that "equality of distribution amongst creditors" is a fundamental bankruptcy principle. Thereafter, the Stipulated Order Approving Amended and Clarified Bid was entered which provided that "The Buyers' purchase of the Unsecured

10

Liabilities does not extinguish the claims underlying the Unsecured Liabilities" (DK 1079).  The order further provided that the NHL subordinated its rights in the purchased claims to all allowed unsecured claims except the claims of Moyes and Gretzky.  Stipulations are binding on the stipulating parties.  Matter of Springpark Assoc., 623 F.2d 1377 (9th Cir. 1980), cert. denied 449 U.S. 956, 101 S.Ct. 364 (1982);  In re Herrera, 23 B.R. 796 (9th Cir. B.A.P. 1982)

It appears to the court that the reasons for initially denying the NHL's bid to purchase the Coyotes because of the NHL's claimed right to control the sale proceeds and the terms of the stipulated sale order which effectively allowed the NHL to control the sale proceeds are ambiguous, at a minimum, if not fundamentally inconsistent.  Notably, this point has not been briefed by the parties. If the Moyes are bound by the stipulated order, they may be liable for these amounts consistent with the terms of the order.  Conversely, if the NHL is bound by the court's order that it can not control the sale proceeds in violation of the provisions of the Bankruptcy Code and its representation to the court that it would "pay" these creditors then it may be barred from pursuing this claim.  Either way summary judgment is not warranted on this record.

### THE NHL HAS NOT ESTABLISHED THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON ITS ATTORNEY'S FEE CLAIM AND, AT A MINIMUM, SOME PORTION OF THOSE FEES ARE BARRED BY PREEMPTION

The NHL claims that under the Consent Agreement and Guaranty the Moyes are liable for the approximate fifteen million dollars incurred by it in enforcing it rights before the bankruptcy court and in selling or attempting to sell the hockey team.  There may be some merit to a portion of the NHL's claim but there are also some apparent unresolved facts and/or issues regarding such claim which preclude summary judgment at this time.

11

The NHL has presented its claimed right to recover these expenses as one total amount. Notably there is no allocation or other break down of the reason for incurring these fees and expenses. Without far more specificity from the NHL regarding both the precise amount of the fees incurred and the basis for such expense, the court assumes that there will be no summary judgment on this issue for the NHL. The NHL and its affiliated entities appeared before this court in multiple capacities including, but not limited to, secured creditor, dip lender, non-debtor party to an executory contract, defendant, auction bidder, and purchaser of the debtors' assets. Although not making a ruling, the court is, at a minimum, not convinced and doubtful that the NHL is entitled to all of its incurred expenses/attorney's fees for all of the multiple capacities that it acted in or in connection with the bankruptcy case and related actions . For example, in May 2009, the debtors filed an antitrust action (Adv. 09-494) against the NHL. The NHL filed a motion to dismiss which was never presented to the court for ruling and, ultimately, the action was voluntarily dismissed by the plaintiffs (Dk 44) on November 5, 2009. The NHL did not seek to recover any of its attorney's fees it incurred in that action. Similarly are some of the other attorney's fees that the NHL incurred in the bankruptcy case; the NHL acknowledges that the fees it now claims were incurred in "enforcing its rights before the bankruptcy court". At a minimum, a portion of those fees were incurred by the NHL in its capacity as a secured creditor and the DIP lender to the chapter 11 debtor. The NHL did not seek to recover or otherwise collect such fees from the bankruptcy estate. For the reasons set forth above on bankruptcy preemption, the NHL can not now seek to recover those fees in this action.

12

## CONCLUSION

For the reasons set forth above, the Moyes' motion for partial summary judgment is granted on the claims for (1) the operating losses incurred by the NHL or its affiliate, (2) aiding and abetting a breach of fiduciary duty, and (3) recovery of the amounts owed to Gretzky.  All of the remaining motions are denied, without prejudice.  No later than 14 days from the date of this minute entry decision, counsel for Moyes shall serve and lodge an appropriate order.

A further scheduling hearing is set for November 19, 2013 at 10:00 a.m. at 230 N. First Ave. 3rd Floor, Courtroom No. 301, Phoenix, AZ.


Copy emailed 10/4/13 to:

David Mordkoff
Bradley Ruskin
Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
dmordkoff@proskauer.com
bruskin@proskauer.com

Alan Meda
Stinson Morrison Hecker LLP
1850 N. Central Ave. #2100
Phoenix, AZ 85004
ameda@stinson.com

Thomas Salerno
Squire Dander (US) LLP
1 E. Washington St. #2700
Phoenix, AZ 85004
thomas.salerno@squiresanders.com

13

Stephen Susman
Susman Godfrey LLP
560 Lexington Ave. 15th Floor
New York, NY 10022
ssusman@susmangodfrey.com

Oleg Elkhunovich
Susman Godfrey LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
oelkhunovich@susmangodfrey.com

By:  /s/ Lorraine Davis
        Deputy Clerk

14