WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

National Hockey League,

               Plaintiff,

v.

Jerry Moyes, et al.,

               Defendants.

No. CV-10-01036-PHX-GMS

**ORDER**

Pending before the Court are the Parties' Cross Motions for Summary and Partial Summary Judgment.  Also pending is the Report and Recommendation ("R & R") of United States Bankruptcy Judge Redfield T. Baum, which recommends that Defendants' Motion be granted in part and denied in part and that Plaintiff's Motion be denied.  (Doc. 98.)  Plaintiff National Hockey League (the "NHL") made timely objections to Judge Baum's R & R (Doc. 107), to which Defendants ("the Moyes Parties") responded (Doc. 110).  For the following reasons, the R & R is accepted in part, Defendants' Motion is granted in part and denied in part, and Plaintiff's Motion is granted in part and denied in part.

## BACKGROUND

In September 2006, Jerry Moyes, Vickie Moyes, and the Jerry and Vickie Moyes Family Trust (collectively "the Moyes Parties") became the controlling owners of the Coyotes professional hockey team and the Coyotes' hockey arena in Glendale, AZ

through their ownership of a series of limited liability companies.[1]  (A89–90, A166.)[2]  On September 27, 2006, the Moyes Parties entered into two agreements with the NHL: a Consent Agreement and a Guaranty.  (A90, A166.)  The Consent Agreement bound the Moyes Parties, the Coyotes, and all entities under their control with an ownership interest in the Coyotes to the NHL Constitution and Bylaws.  (A92.)  The Consent Agreement further required the Coyotes to stay in Arizona for at least seven years and stated that any transfer of ownership interest or relocation of the Coyotes must comply with the NHL transfer or relocation procedures.  (A16, 420.)  Under the Guaranty, the Moyes Parties agreed that they would be liable for the Coyotes' losses for up to $30 million, which was later reduced to $15 million by agreement.  (A8–11, A92.)

By summer of 2008, "[the Moyes Parties] had advanced over $300 million to operate the Phoenix Coyotes," an ailing franchise which had "sustained annual financial losses in excess of $36 million in 2006, 2007, and 2008."  *In re Dewey Ranch Hockey, LLC*, 406 B.R. 30, 33-34 (Bankr. D. Ariz. 2009) [hereinafter *Dewey Ranch I*].  The Coyotes' annual financial statements from 2004 until 2008 each "contain a statement by the certified public accountants that the financial statements 'raise[d] substantial doubt as to the Company's ability to continue as a going concern.'"  *In re Dewey Ranch Hockey, LLC*, 414 B.R. 577, 579-80 (Bankr. D. Ariz. 2009) [hereinafter *Dewey Ranch II*].  "At the request of the Moyes group, the NHL began advancing funds for the operations in August 2008."  *Dewey Ranch I*, 406 B.R. at 33-34.  Beginning in autumn of 2008, the Moyes Parties held various meetings with the NHL, Glendale, and others in an attempt to resolve the Coyotes' financial problems.  *Id.* at 34.  The Moyes Parties and the NHL agreed that

---

[1] Jerry and Vickie Moyes are the co-trustees and beneficiaries of the Jerry and Vickie Moyes Family Trust. Jerry Moyes owned 99% and Vickie Moyes owned 1% of Coyotes Holdings MemberCo, LLC. MemberCo owns 24.86% of Coyotes Holdings, LLC, and the Trust owns 75.14% of Coyotes Holdings, LLC. Coyotes Holdings, LLC is the Managing Member and owner of 91.79% of the units of Coyotes Hockey, LLC. Coyotes Hockey, LLC is the Coyotes' legal entity.

[2] The Parties have submitted a joint appendix. (*See* Doc. 109.) Citations to the appendix in this Order follow the Parties' pagination, designated as the letter "A" with page numbers.

they would seek a buyer for the Coyotes and that the NHL would finance the Coyotes' losses until the sale.  (A2; A156.)

In 2008 and 2009, without the NHL's knowledge, the Moyes Parties began discussions to sell the team to James Balsillie who wanted to relocate the Coyotes to Hamilton, Ontario, Canada.   (A158, A168.)   When the NHL learned of these negotiations, the NHL told the Moyes Parties to stop negotiating because the NHL would not allow the Coyotes to relocate.  (A23.)  The Moyes Parties nevertheless executed an Asset Purchase Agreement ("APA") to sell the Coyotes to Balsillie and relocate the team to Hamilton.  (A3089.)  The APA required authorization from a bankruptcy court before the sale could be finalized.  (A97–100.)  The Moyes Parties then caused the companies that owned the Coyotes and that managed the arena to file for Chapter 11 bankruptcy. (A241, A260–61, A414.)  Two days later, the Moyes Parties caused the debtor companies to file an adversarial antitrust suit against the NHL, which they later voluntarily dismissed.   (A144.)   The NHL and the City of Glendale, Arizona objected to the proposed sale to Balsillie, which was not approved by the bankruptcy court.  (A171.)

During the bankruptcy proceeding, the NHL submitted a bid to purchase the Coyotes for $140 million.  (A171; A261.)  Defendants objected, and the bankruptcy court denied this initial bid without prejudice because it failed to equally distribute the Coyotes' assets to all creditors.  (*Id.*)  Specifically, NHL's initial bid proposed to pay in full all of the Coyotes' creditors except the Moyes Parties, who were the principal creditors of the Coyotes, and Wayne Gretzky ("Gretzky"), the Coyotes' head coach.  (*Id.*) An equal distribution, as mandated by the law, would have substantially benefited the Moyes Parties and Gretzky.  (*Id.*)

The NHL then submitted a second restructured bid to the bankruptcy court. The NHL represented to the bankruptcy court that the economics of this second bid were the same but that the structure was slightly different.  (A301.)  Specifically, the second bid provided that the NHL would purchase the Coyotes from the Moyes Parties for $128.4 million and purchase approximately $11.6 million of the Coyotes' unsecured claims (the

two amounts totaling $140 million, the amount the NHL had initially offered to pay the Moyes Parties to purchase the Coyotes). (A366.) The Moyes Parties objected and the bankruptcy court rejected the second bid, but at a status conference held on October 26, 2009, the parties conferred during a recess and reached an agreement. (A2253.) The NHL would purchase the team for $128.4 million and would purchase the unsecured claims for $11.6 million, both the NHL and the Moyes Parties would reserve all rights and defenses regarding the Guaranty, and the Moyes Parties' liability under the Guaranty would be capped at $15 million. (A2255-56.) Gretzky did not object to the sale under these terms. (A1494-95.) On November 2, 2009, the court entered a Stipulated Order Approving Amended and Clarified Bid, accepting the second bid on the agreed upon terms. (A1488.)

On March 5, 2010, the NHL sued the Moyes Parties in New York state court. The NHL makes claims against the Moyes Parties: (1) for aiding and abetting the breach of fiduciary duty owed by the Coyotes to the NHL, (2) for breach of the Consent Agreement, and (3) as a guarantor under the Guaranty. (Complaint, Doc. 1 at 31-36.) The NHL's claims fall into four categories of damages: (1) the operating losses that the NHL incurred after purchasing the Franchise, (2) the NHL's attorneys' fees and expenses incurred during the bankruptcy proceedings, as well as those incurred after purchasing the Franchise, (3) the amounts the Coyotes owed to the unsecured creditors, which claims were guaranteed by the Moyes Parties and purchased by the NHL as part of its acquisition of the Coyotes , and (4) the amounts owed to Wayne Gretzky and not paid by the Coyotes, which were also guaranteed by the Moyes Parties. (R & R, Doc. 98 at 2.)

The suit was removed to the Southern District of New York and then transferred to this Court as a more convenient forum pursuant to 28 U.S.C. § 1404(a). (Doc. 1.) On September 15, 2010, this Court referred this suit to the bankruptcy court pursuant to General Order 01-15 of this District because this suit was related to the bankruptcy proceeding of the entities that owned the Coyotes. (Doc. 66.)

On January 21, 2015, after determining that the NHL's claims are *Stern* claims

requiring disposition by a federal district court, the bankruptcy court entered the current R & R with its accompanying conclusions of law.  *See Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011) (recognizing certain counterclaims as core proceedings within the definition of 11 U.S.C. § 157(b)(2)(C), but holding that bankruptcy courts do not have jurisdiction to enter final judgments on all such claims); *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014) (holding that *Stern* claims may be disposed of in bankruptcy court in the same manner as non-core proceedings—that is, the bankruptcy court must submit findings of fact and conclusions of law to the district court to be reviewed de novo).

The bankruptcy court, in its R & R, proposed the following conclusions of law:

1. The bankruptcy preemption doctrine precludes the NHL from recovering any of its attorney's fees and expenses incurred prior to November 2, 2009.

2. Under the Agreements, the NHL is entitled to recover its attorney's fees and costs incurred after November 2, 2009.

3. The NHL paid the unsecured creditors at or prior to the November 2, 2009 closing and, therefore, there are no unpaid debts of the Coyotes to support the NHL's claim against Moyes under the Agreements.

4. Based upon the uncontested evidence and representations before the bankruptcy court, the NHL is judicially estopped from claiming that the unsecured debts have not been paid.

5. The NHL's claim against Moyes for the unpaid amounts owed Gretzky [is] barred by the doctrine of judicial estoppel.

6. The NHL's claims for its post acquisition losses are not recoverable because the losses were not foreseeable when the contracts were made and the express terms of the Agreements do not apply to those losses.

7. The bankruptcy preemption doctrine precludes the NHL's claim for damages for aiding and abetting a breach of fiduciary duty.

(Doc. 98 at 13.)

The bankruptcy court also recommends that this Court hold that the NHL's claims

for attorneys' fees and expenses incurred before November 2, 2009 are barred by judicial estoppel and that "any claims by the NHL based upon negotiations, failing to disclose such negotiations, agreeing to sell and relocate the Coyotes through the bankruptcy process, and the filing of the antitrust adversary action in the bankruptcy court are all barred by the bankruptcy preemption doctrine." (*Id.* at 5.)

The R & R would grant summary judgment to the Moyes Parties on "all of the NHL's claim[s] except for its claim for attorney's fees and expenses incurred after November 2, 2009, which claim must be tried to a jury, pursuant to the NHL's demand for a jury trial." (*Id.* at 14.)

The NHL objected to all of Judge Baum's conclusions of law, except for the conclusion that the NHL is entitled to recover its attorney's fees and costs incurred after November 2, 2009. (Doc. 107.)

**DISCUSSION**

**I.    Legal Standard**

The bankruptcy court has submitted proposed findings of fact and conclusions of law, which this Court reviews de novo before entering judgment. *Stern*, 131 S. Ct. at 2603; *Executive Benefits*, 134 S. Ct. at 2173.

The Court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence "in a light most favorable to the non-moving party." *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). Where the parties have filed cross-motions for summary judgment, the Court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 2015 WL 5315388, at *2 (9th Cir. Sept. 14, 2015) (quoting *ACLU v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir.2003)). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

1    demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,

2    477 U.S. 317, 323 (1986).

3          The party opposing summary judgment "may not rest upon the mere allegations or

4    denials of [the party's] pleadings, but . . . must set forth specific facts showing that there

5    is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v.

6    Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*,

7    53 F.3d 1044, 1049 (9th Cir. 1995).  Substantive law determines which facts are material,

8    and "[o]nly disputes over facts that might affect the outcome of the suit under the

9    governing law will properly preclude the entry of summary judgment." *Anderson v.

10   Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact issue is genuine 'if the evidence is

11   such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v.

12   Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S.

13   at 248).  Thus, the nonmoving party must show that the genuine factual issues "can be

14   resolved only by a finder of fact because they may reasonably be resolved in favor of

15   either party."  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818

16   F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

**II.    Analysis**

18         The NHL makes claims against Moyes (1) for aiding and abetting a breach of

19   fiduciary duty owed by the Coyotes to the NHL (Count III of the Complaint), (2) for

20   breach of the Consent Agreement (Counts I and II), and (3) for obligations under the

21   Guaranty (Counts IV and V).  (Complaint, Doc. 1 at 31-36.)

**A.    Aiding and Abetting a Breach of Fiduciary Duty (Count III)**

23         Count III of the Complaint, aiding and abetting a breach of fiduciary duty, alleges

24   that "Moyes caused the Coyotes to violate its fiduciary duty . . . by secretly negotiating

25   with Balsillie and his agents for the sale of the Coyotes in violation of the NHL

26   Constitution and Bylaws; by having his representative lie to the NHL Commissioner

27   about the status of any pending discussions to sell the Club, by directing the Coyotes and

28   its affiliated holding companies to file bankruptcy; by agreeing to a purported sale and

relocation of the Coyotes without notifying or seeking the approval of the NHL; and by suing the NHL to invalidate the transfer restrictions contained in the Consent Agreement, and in the NHL Constitution and Bylaws." (*Id.* at ¶ 78.)  Plaintiff alleges that "Jerry Moyes acted maliciously in aiding and abetting the Coyotes' breach of fiduciary duties by acting deliberately with knowledge of the NHL's rights and with an intent to interfere with those rights." (*Id.* at ¶ 82.)

The bankruptcy court concluded that "[t]he bankruptcy preemption doctrine precludes the NHL's claim for damages for aiding and abetting a breach of fiduciary duty." (Doc. 235 at 13.)  This Court reviews that conclusion de novo and adopts the bankruptcy court's recommendation with respect to the tort claim only.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012) (quoting U.S. Const. art. VI, cl. 2). "Under this principle, Congress has the power to preempt state law." *Id.*  An analysis of the scope of bankruptcy preemption begins with the presumption that state law will not be preempted.  *See Pac. Gas & Elec. Co. v. California ex rel. California Dept. of Toxic Substances Control*, 350 F.3d 932, 943 (9th Cir. 2003).  "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Federal law can preempt state law in three ways:  express preemption, field preemption, and conflict preemption.  *See Arizona*, 132 S. Ct. at 2500-01.  In the absence of express statutory language indicating preemption, "[s]tate law must also give way to federal law in at least two . . . circumstances."  *Id.* at 2501.  "First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Id.*  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is

a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).  "Second, state laws are preempted when they conflict with federal law." *Id.*  Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," *id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 (1963)), as well as "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Where state law tort claims call into question whether a bankruptcy was filed for an improper purpose or in bad faith, these claims are preempted by federal bankruptcy law, "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 913 (9th Cir. 1996) (quoting *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53 (1982)).  "[T]he adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process." *Id.* at 914.  "Debtors filing bankruptcy petitions are subject to a requirement of good faith, and violations of that requirement can result in the imposition of sanctions." *Gonzales v. Parks*, 830 F.2d 1033, 1035-36 (9th Cir. 1987).  These sanctions constitute "an implicit rejection of other penalties, including the kind of substantial damage awards that might be available in state court tort suits." *Id.* at 1036.

In *Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003), the plaintiff sued for aiding and abetting a breach of fiduciary duty, alleging "that the defendant induced a third party to file for bankruptcy, harming the plaintiff."  Relying on the Ninth Circuit decision in *MSR Exploration* and emphasizing the "broad scope of bankruptcy preemption," the court concluded that any misuse of the bankruptcy process is "governed exclusively" by the Bankruptcy Code, and thus "claims . . . requiring a

finding that [a bankruptcy was filed] in bad faith or for an improper purpose, as measured by the standards of New York tort law, are therefore barred." *Id.* at 262-63.

Even where the state law claim is brought against a non-bankruptcy party, rather than the debtor, a claim "that could have been made, and for which a remedy is provided, under the Bankruptcy Code cannot be the subject of regulation by state statutory or common-law remedies." *Id.* at 262. An aiding and abetting claim for inducing a third party to file bankruptcy would necessarily question "whether [the bankruptcy] petition had been filed in 'good faith' within the meaning of the Bankruptcy Code," and doing so would contravene "the principle that no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant." *Choy v. Redland Ins. Co.*, 127 Cal. Rptr. 2d 94, 103 (2002) (qtd. in *Astor Holdings*, 325 F. Supp. 2d at 262). "[E]ven slight incursions and disruptions brought about by state malicious prosecution actions" infringe upon the "uniquely and exclusively federal" bankruptcy process. *MSR Exploration*, 74 F.3d at 914.

Here, the NHL alleges tortious conduct relating to an attempted unauthorized sale of the Coyotes by means of filing bankruptcy. This amounts to an assertion that the bankruptcy filing was for an improper purpose or in bad faith. To the extent that the NHL alleges that the Moyes Parties aided and abetted a breach of fiduciary duty by causing the debtors to file bankruptcy, the claim is preempted. *Astor Holdings*, 325 F. Supp. 2d at 262-63.

The NHL argues that to the extent that its tort claim comprises pre-filing conduct, the claim is not preempted, citing *Davis v. Yageo Corp.*, 481 F.3d 661, 679-80 (9th Cir. 2007). (Doc. 149 at 1.) In *Davis*, the Ninth Circuit held that "breach of fiduciary duty claims are not preempted by federal bankruptcy law [where] these claims concern conduct that occurred *prior to* bankruptcy," as opposed to preempted claims "involving conduct that occurred *during* bankruptcy." *Id.* at 678. The bankruptcy court in *Davis* had "explicitly assigned to plaintiffs all pre-bankruptcy claims . . . over defendants'

objections." *Id.* at 680. "Since the bankruptcy court limited the assignment to claims that 'existed . . . prior to the Chapter 11 filing[],' the assignment was valid." *Id.*

The plaintiffs in *Davis* sought damages that accrued pre-petition and would have accrued whether or not the bankruptcy petition was filed. *Dux Capital Mgmt. v. Chen*, 2004 WL 1936309, at \*16 (N.D. Cal. Aug. 31, 2004) *aff'd sub nom. Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007) ("[T]he injury and the main factual issue for the jury to determine were whether the directors breached their fiduciary duty—before the petition—by choosing the bankruptcy option rather than at least evaluating some other course of action that might have provided the company and its shareholders with more value."). Damages did not flow from the bankruptcy or any consequences of the bankruptcy, but rather accrued "*before* the [bankruptcy] petition," when the defendants "spurn[ed] the alternatives" that could have been valuable to the company. *Id.* (emphasis in original).

Under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires . . . that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (2003). "A tort claim accrues as soon as 'the claim becomes enforceable, i.e., when all the elements of the tort can be truthfully alleged in a complaint.'" *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 140-41 (2009) (quoting *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993)). Where "damage is an essential element" in a tort claim, "the claim 'is not enforceable until damages are sustained.'"[3] *Id.*

When damages arise only after and because of the bankruptcy filing, a claim based on pre-filing conduct is preempted. *Casden v. Burns*, 504 F. Supp. 2d 272, 281-82 (N.D. Ohio 2007) *aff'd on other grounds,* 306 F. App'x 966 (6th Cir. 2009) ("When, as here, injury . . . might never occur, and thus plaintiff's claim would not accrue . . . until after the company files its bankruptcy petition, and accrual of the claim depends on what

---

[3] The same is true under California law, which was the state law applicable to *Davis*. *Dux Capital Mgmt.*, 2004 WL 1936309, at \*18.

happens in the Bankruptcy Court, the potential future claim would interfere sufficiently with the bankruptcy process to trigger preemption."); *see also In re Miles*, 430 F.3d 1083, 1092 (9th Cir. 2005) ("[W]e hold that 11 U.S.C. § 303(i) completely preempts state law tort actions for *damages predicated upon the filing* of an involuntary bankruptcy petition." (emphasis added)).

Here, the NHL has not identified any actual damages suffered as a result of the Moyes Parties' pre-filing conduct—their negotiations with Balsillie, the failure to disclose such negotiations, or the agreement to sell the Coyotes to Balsillie and relocate the Coyotes to Canada—aside from those that arose after the bankruptcy filing and depended upon the bankruptcy proceedings. The NHL has not indicated that the Moyes Parties rejected alternative options that would have provided more value, as was the case in *Davis*.[4] *Cf. Dux Capital Mgmt.*, 2004 WL 1936309, at *16. Balsillie, on behalf of PSE, was the only buyer willing to purchase the Coyotes at the time of the bankruptcy. The Reinsdorf Group and Ice Edge, both of which had the opportunity to submit bids during the bankruptcy, declined to do so. *See Dewey Ranch II*, 414 B.R. 577, 585 (Bankr. D. Ariz. 2009) ("On August 25th . . . the NHL submitted its bid . . . . By this date, the other two potential bidders for the Coyotes [aside from PSE], the Reinsdorf Group and Ice Edge . . . had publicly announced that they would not be submitting any bid(s) at the court auction."). The Court therefore holds that no reasonable juror could conclude

---

[4] According to the bankruptcy court, "[t]he Official Unsecured Creditors' Committee generally support[ed] the [sale to Balsillie] because the committee ha[d] concluded that the sooner there [was] a sale/auction the better the chances of the greatest recovery for the unsecured creditors." *Dewey Ranch I*, 406 B.R. 30, 35 (Bankr. D. Ariz. 2009). "Unsurprisingly, [Moyes] support[ed] the sale because he consider[ed] it in the best interests of the creditors and [because it would provide] the greatest return to the creditors." *Id.* It appeared to the bankruptcy court "that the sale proceeds would most likely provide a material return to the general creditors." *Id.* at 41. Balsillie's final bid was $242,500,000 "if Glendale accepted [Balsillie's] $50,000,000.00 offer to withdraw its objection to the sale," or $212,500,000 without Glendale's acceptance. *Dewey Ranch II*, 414 B.R. 577, 587 (Bankr. D. Ariz. 2009). The NHL maintains that the Moyes Parties should have done exactly what the NHL chose to do after it purchased the franchise—run the Coyotes in Glendale at a loss for years, at least until finding a buyer who was willing to do the same. This alternative provided far less value to the Coyotes' creditors generally.

that sales to either of these two entities constituted viable alternatives.  Because the NHL did not allege damages that accrued other than from the bankruptcy process, the NHL has failed to establish all of the elements of its tort claim, which therefore must fail as a matter of law.

Furthermore, a tort claim for aiding and abetting a breach of fiduciary duty must be distinct from breach of contract claims.  "[A] contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract."  *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992) (quoting *N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 179 (1968)).  "[W]hile causes of action for breach of fiduciary duty that merely restate contract claims must be dismissed, conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract."  *Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148-49 (2007).

Here, the NHL's tort claims merely restate its contract claims.  Under New York law, "[s]ince the plaintiff is not alleging tort liability or a breach of a duty distinct from, or in addition to, the breach of contract claim, these causes of action should be dismissed."  *Layden v. Boccio*, 686 N.Y.S.2d 763, 764 (1998); *see also Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 249 (S.D.N.Y. 2011) *on reconsideration,* No. 09 CIV. 8025, 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011) (quoting *Centro Empresarial Cmpresa S.A. v. America Movil, S.A.B. de C.V.,* 901 N.Y.S.2d 618, 636 (1st Dept. 2010)) ("[U]nder New York law, 'a cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand.'"); *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); *Sommer*, 79 N.Y.2d at 551 ("[M]erely alleging that the breach of contract duty arose from a lack of due care will not transform a simple breach of contract into a tort.").

1    The Court therefore grants Defendants' motion for summary judgment on

2    Count III, aiding and abetting a breach of fiduciary duty.

3    **B.    Contract Claims under the Consent Agreement (Counts I and II)**

4    **1.    Breach of the Consent Agreement (Count I)**

5    Count I of the NHL's Complaint alleges breaches of the Consent Agreement "by,

6    among other things, conducting secret negotiations with Balsillie and his agents regarding

7    the potential sale and relocation of the Coyotes, by signing the Asset Purchase Agreement

8    with PSE, by directing the Phoenix Coyotes and its affiliated holding companies to enter

9    bankruptcy and by suing the NHL to invalidate the transfer restrictions contained in the

10   Consent Agreement, and in the NHL Constitution and By-Laws."  (Complaint, Doc. 1 at

11   19 ¶ 70.)

12   **a.    Directing Debtors to Enter Bankruptcy**

13   One of the allegations in Count I of the Complaint is that the Moyes Parties

14   breached the Consent Agreement "by directing the Phoenix Coyotes and its affiliated

15   holding companies to enter bankruptcy."  (*Id.*)  If any terms in the Consent Agreement or

16   NHL Constitution exist that restrict the right of the debtor parties to file bankruptcy, such

17   terms are not enforceable.  *In re Cole*, 226 B.R. 647, 651-54 (B.A.P. 9th Cir. 1998); *see*

18   *also, e.g.*, *In re Thorpe Insulation Co.*, 677 F.3d 869, 890-91 (9th Cir. 2012) [hereinafter

19   *Thorpe I*] ("[T]he anti-assignment provisions contained in the contracts . . . stand as an

20   obstacle to completion of a successful § 524(g) plan, and therefore are preempted by

21   federal bankruptcy law."); *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1026 (9th Cir.

22   2012) [hereinafter *Thorpe II*] (holding that contractual terms that directly or indirectly

23   proscribe seeking bankruptcy protection contravene public policy and are unenforceable);

24   *Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir. 1966) ("[T]he Bankruptcy Act expresses a

25   strong legislative desire that deserving debtors be allowed to get a fresh start. . . . [A]n

26   advance agreement to waive the benefits of the Act would be void."); *In re Madison*, 184

27   B.R. 686, 690 (Bankr. E.D. Pa. 1995) ("[A]n agreement not to file bankruptcy is

28   unenforceable because it violates public policy. . . . [I]f agreements prohibiting

- 14 -

bankruptcies were given force, the [Bankruptcy] Code could be nullified in the vast majority of debts arising out of contracts.").

If a contractual term denying the debtor parties the right to file bankruptcy is unenforceable, then a contractual term prohibiting the non-debtor party that controls the debtors from causing the debtors to file bankruptcy is equally unenforceable. Parties cannot accomplish through "circuity of arrangement" that which would otherwise violate the Bankruptcy Code. *Nat'l Bank of Newport v. Nat'l Herkimer Cnty. Bank*, 225 U.S. 178, 184 (1912) (holding that a provision of the Bankruptcy Act that voided the granting of a preference applies whether the transfer is "made directly to the creditor" or "made to another, for his benefit" because the effect is the same). "Any attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable. The Bankruptcy Code preempts the private right to contract around its essential provisions." *Thorpe II*, 671 F.3d at 1026 (quoting *In re Pease,* 195 B.R. 431, 435 (Bankr. D. Neb. 1996)). Even where a contract "does not specifically mention bankruptcy," any contractual term that in effect waives bankruptcy benefits is unenforceable. *Id.*

Plaintiff asserts that "in exchange for the NHL's permission to purchase the Club and have it play in Arizona, the Moyes Parties promised the NHL that they would keep the Club there for at least seven years and pay its debts." (Doc. 107 at 25.) This assertion reflects the NHL's interpretation of Sections 7(d)(i) and (ii) of the Consent Agreement, which the NHL characterize as requiring the Moyes Parties to "(i) maintain $10 million in Net Working Capital and (ii) timely pay all Operating Expenses," combined with Section 4(c), which precludes the Moyes Parties from moving, transferring, or selling the Franchise. (*Id.* at 13.) To the extent that the NHL asserts that the Consent Agreement obligates the Moyes Parties to fund a fully operating franchise for seven years in spite of the franchise's operating losses without inducing the debtor party to seek bankruptcy protection absent the NHL's approval, this contractual obligation is unenforceable and preempted by the Bankruptcy Code. A contractual

- 15 -

provision that indirectly prohibits filing bankruptcy stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and is therefore preempted. *Thorpe I*, 677 F.3d at 890-91 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).

The Court therefore grants Defendants' motion for summary judgment on Count I to the extent that the claim pertains to inducing the debtors to file bankruptcy.

### b.      Negotiations with Balsillie and Attempted Sale to PSE

On the other hand, the contractual terms prohibiting the Moyes Parties from attempting to move or transfer the Coyotes or from selling the Coyotes without NHL consent do not restrict bankruptcy rights. (*See* Consent Agreement at A32, A34-35.)  The Moyes Parties could have induced the debtor parties to file bankruptcy without violating these contractual terms.  Instead, the Moyes Parties attempted to sell the Coyotes without the NHL's consent and to relocate them, and in doing so, they breached clauses 4(c) and 6(c) of the Consent Agreement.  (*Id.*)   Although the Asset Purchase Agreement the Moyes Parties entered into with PSE was "expressly conditioned on the filing of a bankruptcy proceeding and Bankruptcy Court approval," (Defendants' Statement of Facts at A158,) the breached contractual terms did not place impermissible restraints on bankruptcy.  Filing bankruptcy does not relieve the Moyes Parties of their liability for breaches of independent, ostensibly enforceable[5] terms in their contract with the NHL. "This is not a case where a separate state action will interfere with the uniformity required in bankruptcy proceedings or with the control of the bankruptcy court over those proceedings.  It is a simple matter of enforcing contract law and deciding claims arising out of actions which allegedly breached contracts." *Hinduja v. Arco Products Co.*, 102 F.3d 987, 990 (9th Cir. 1996).    Breach of contract claims are not preempted by the Bankruptcy Code where the contractual term itself does not directly or indirectly limit a

---

[5] This order determines that Sections 4(c) and 6(c) of the Consent Agreement are not preempted by federal bankruptcy law, and it assumes without deciding that these sections are otherwise enforceable.

party's rights regarding bankruptcy or otherwise infringe on the bankruptcy process. *See In re Extended Stay Inc.*, 435 B.R. 139, 149 (S.D.N.Y. 2010) (holding that a breach of contract action is not preempted by the Bankruptcy Code where the action "does not seek to invoke common law or other extraneous doctrines to label wrongful, or punish, the exercise of rights under the Bankruptcy Code, nor does it question the legal validity or propriety of the Debtors' [bankruptcy] filings").

Section 4(c) of the Consent Agreement states:

> [Defendants] acknowledge, covenant and agree that for a period of at least seven (7) calendar years from the date hereof, they will not: (i) move or transfer, request to move or transfer, or attempt to move or transfer, the Franchise to a new Home Territory, [or] (ii) engage or participate in discussions or negotiations with a third party relating to moving or transferring the Franchise to a new Home Territory . . . .

(A32.)

Section 6(c) of the Consent Agreement states, in part:

> [Defendants] acknowledge and agree that: (i) . . . any proposed transfer of the location of the Franchise and any proposed [t]ransfer of any of the assets of, or any direct or indirect ownership or other interest in . . . the Club, are subject to and conditioned upon . . . the NHL's prior written consent . . . . (iii) . . . [Defendants] shall not, nor shall they cause or permit, without the prior written approval of the NHL: . . . (C) any transaction that will result in a change, directly or indirectly, in the ownership or management of the Club . . . .

(A34-35.)

The parties do not dispute that the Moyes Parties authorized their attorney, Earl Scudder, to negotiate with Richard Rodier, a representative of Balsillie, regarding the potential sale to PSE and move of the Coyotes to Canada. (A128.)  Scudder's actions, which are attributable to the Moyes Parties, constituted a breach of Section 4(c) of the Consent Agreement.  The parties likewise do not dispute that on May 5, 2009, the Moyes Parties entered into an Asset Purchase Agreement with PSE for the sale of the Coyotes. (A158.)   This constituted a breach of Section 6(c) of the Consent Agreement.

Under New York law, a contract claim differs from a tort claim in that "a breach of contract cause of action accrues at the time of the breach." *Ely-Cruikshank Co. v.*

*Bank of Montreal*, 81 N.Y.2d 399, 402 (1993).  "Since nominal damages are always available in breach of contract actions, all of the elements necessary to maintain a lawsuit and obtain relief in court [are] present at the time of the alleged breach . . . ."[6]  *Id.* (internal citations omitted).  As such, the *Casden* analysis is limited to tort claims. Unlike a tort claim, a breach of contract claim is not preempted when actual damages, if any, arise only after and because of the bankruptcy filing.  The Court therefore grants summary judgment to the NHL regarding liability on Count II to the extent that it alleges breaches of contract based on the Moyes Parties' pre-filing negotiations with Balsillie and attempted sale to PSE.

However, the Court holds as a matter of law that the operating losses the NHL incurred after purchasing the Coyotes do not constitute actual damages arising from these breaches.

Under New York law, recoverable damages for breach of contract include both "general" damages and "special" or "consequential" damages.  *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 319 (1989).  "It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach."  *Id.*  "Special, or consequential damages, which 'do not so directly flow from the breach,' are also recoverable in limited circumstances."  *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192 (2008) (quoting *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 43 (1989)). Whereas general damages seek to provide a plaintiff with the benefit of the bargain, consequential damages, by contrast, "seek to compensate a plaintiff for additional losses

---

[6] "Fundamentally different functions are served by an action in tort on the one hand, and an action in contract on the other, and an understanding of that functional difference is critical to understanding why nominal damages are appropriate in one and not in the other.  Contract liability is imposed by the law for the protection of a single, limited interest, that of having the promises of others performed.  The law of torts is concerned with the allocation of losses arising out of human activities.  In other words, a party's rights in contract arise from the parties' promises and exist independent of any breach. Nominal damages allow vindication of those rights.  In tort, however, there is no enforceable right until there is loss. It is the incurring of damage that engenders a legally cognizable right."  *Kronos*, 81 N.Y.2d at 96 (internal citations omitted).

(other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000).

To obtain consequential damages, "a plaintiff must demonstrate that the parties contemplated those special damages 'as the probable result of the breach at the time of or prior to contracting.'" *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F.Supp.2d 280, 292 (S.D.N.Y. 2009) (quoting *Kenford*, 73 N.Y.2d at 319).   "In determining the reasonable contemplation of the parties," the Court should consider "the nature, purpose and particular circumstances of the contract known by the parties . . . as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'"   *Kenford*, 73 N.Y.2d at 319 (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544 (1903)); *see also, e.g.*, *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993); *Bi-Econ.*, 10 N.Y.3d at 192-93 (2008) ("Consequential damages [are] designed to compensate a party for reasonably foreseeable damages[.]").

Both the Consent Agreement and the Guaranty provide that the Moyes Parties guaranteed the "Operating Expenses of the Club," which included "all debts, obligations, liabilities and expenses of the Club in the operation of the Franchise."  (A37; A68.)  The "Club" is defined in the Consent Agreement as Coyotes Hockey, LLC, which is one of the four debtor parties that sold the Phoenix Coyotes hockey team to the NHL.  (A27, A1488.)   Thus, when the NHL purchased the team, the Coyotes were transferred to Coyotes Newco, LLC, and the "Club" was no longer incurring operating expenses in running the franchise.  The Moyes Parties are, therefore, under no obligation to pay such operating expenses under either the Consent Agreement or the Guaranty.

Nor can the operating losses sustained by the NHL after purchasing the Coyotes be general damages arising from the Moyes Parties' breaches.  These losses are not "the natural and probable consequence" flowing from the Moyes Parties' negotiations with Balsillie or attempted sale to PSE.  *Kenford*, 73 N.Y.2d at 319.  The NHL made an independent business decision to purchase the Coyotes and operate the franchise at a loss

for years.  The Moyes Parties' breaches did not directly and proximately cause the NHL's post-acquisition losses.  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages.  Recovery is not allowed if the claimed losses are the result of other intervening causes."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) (internal citations omitted).

Nor can the operating losses be special or consequential damages.  The Moyes Parties cannot "fairly . . . be supposed to have assumed" that special damages arising from breaching the Consent Agreement would include covering losses the NHL might incur should it purchase the Coyotes and then run the team at a loss for years.  *Kenford*, 73 N.Y.2d at 319 (quoting *Globe Ref. Co.*, 190 U.S. at 544).  While bankruptcy was foreseeable at the time of entering into the Consent Agreement, the NHL's response to the debtors' filing bankruptcy was not.  In the past ten years, the NHL has approved five hockey teams filing for bankruptcy and often facilitated "prepackaged" bankruptcy sales where one buyer offered the only bid.  (A609-10.)  Likewise, in the past ten years, the NHL has approved the relocation of five teams.  (A610.)  Several of these events transpired before the Moyes Parties signed the Consent Agreement in 2006.  (A609-10.)  The Moyes Parties could not have foreseen that the NHL would refuse to relocate the Coyotes and instead opt to run the franchise at a loss for years.

Therefore, as a matter of law, the Moyes Parties are not liable for the operating losses the NHL incurred after purchasing the Coyotes.

### 2.    Indemnification Obligations under Section 11(c) (Count II)

Count II of the Complaint alleges that the Moyes Parties breached the indemnity obligation in Section 11(c)(iii) of the Consent Agreement, which provides that the Moyes Parties agreed to indemnify the NHL for all losses arising out of "any breach of any warranty, covenant or agreement . . . by any Seller Party, the Club or any other Investment Party."  (A49.)  Section 11(c)(ii) of the Consent Agreement also provides that Defendants agree to indemnify the NHL for all losses arising out of "any act, omission,

- 20 -

liability or obligation . . . of . . . the Club [or] any other Investment party." (*Id.*) The losses expressly include "without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with Affiliated NHL Parties." (*Id.*)

The bankruptcy court concluded as a matter of law that "the judicial estoppel doctrine precludes the NHL's claim for its attorney's fees and expenses incurred by it prior to November 2, 2009." (Doc. 235 at 12.) The court noted that "in the bankruptcy case, the NHL was entitled to recover all of its reasonable attorney's fees and expenses as a condition of the assumption of the bundle of contract rights acquired by the NHL," and moreover noted that "[f]or whatever reason, the NHL never made any claim for those attorney's fees and expenses in connection with its purchase[] of the Coyotes, which purchase included an assignment and assumption of virtually all of the debtors' executory contracts." (*Id.*) The court concluded that "all attorney's fees and expenses incurred prior to November 2, 2009 should have been claimed by the NHL as a condition of the assignment and assumption of the Coyotes' executory contracts by the NHL and are now barred by the bankruptcy preemption doctrine." (*Id.*)

Contractual agreements to pay attorneys' fees arising in bankruptcy court are not preempted under the Bankruptcy Code. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007) ("This case requires us to consider whether the Bankruptcy Code disallows contract-based claims for attorney's fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law. We conclude that it does not."). Although "[u]nder the American Rule, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," this default rule can be overcome by statute or "by an enforceable contract allocating attorneys' fees." *Id.* at 448. "[A]n otherwise enforceable contract allocating attorney's fees (*i.e.*, one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise." *Id.* If a debtor can be contractually liable for the attorneys' fees its creditors incur in its bankruptcy, it follows that a non-debtor can be contractually liable for the same fees.

Neither the bankruptcy court nor the Moyes Parties have cited any authority for the proposition that a creditor who had the opportunity to seek attorneys' fees from a debtor during its bankruptcy proceeding and failed to do so is estopped or otherwise precluded from later seeking those same fees from a non-debtor party under a state law breach of contract claim.  In the absence of authority suggesting otherwise, this Court holds that a creditor is not estopped or precluded from doing so.

The indemnity clause in Section 11(c) requires the Moyes Parties to indemnify the NHL for losses caused by breaches or acts by seller parties, the Club, and "other" investment parties—it is an indemnification of third party breaches and acts, not of the Moyes Parties' own breaches and acts.  (A49.)  As such, the Moyes Parties maintain that "to the extent the NHL seeks Defendants to indemnify it for a breach by the 'Club,' that breach can only be the filing for bankruptcy, which is preempted [by federal bankruptcy law]."  (Doc. 151 at 4.)  However, to the extent the NHL seeks the Moyes Parties to indemnify it for *an act* by the Club—the act of filing bankruptcy, as well as the act of filing the antitrust suit—this is not preempted by federal bankruptcy law.  A contractual provision stating that a debtor cannot file bankruptcy is preempted and unenforceable.  *In re Cole*, 226 B.R. at 651-54.  A contractual provision stating that if a debtor chooses to file bankruptcy, that debtor (or some other party) must pay the creditor's attorneys' fees is not preempted and is enforceable.  *Travelers*, 549 U.S. at 449.  Although such a contractual provision provides a disincentive to filing for bankruptcy, it does not effectively proscribe or limit bankruptcy protection or otherwise conflict with the Bankruptcy Code, *see id.* at 452-53, nor does it call into question the good faith of the bankruptcy filing.

The parties do not dispute that the Club filed bankruptcy and initiated an antitrust lawsuit against the NHL.  These acts resulted in the NHL's expenditure of attorneys' fees and costs.  The Moyes Parties agreed under Section 11(c)(ii) of the Consent Agreement to indemnify the NHL for losses arising out of any act by the Club.  The Court therefore grants the NHL's motion for summary judgment on the issue of the Moyes Parties'

liability for attorneys' fees and costs accrued in the course of the bankruptcy proceeding and the antitrust suit.

The NHL alleges damages in the amount of "approximately $15.6 million in attorneys' fees and other expenses incurred in connection with the bankruptcy proceedings and the NHL's efforts to sell the Coyotes. (Doc. 107 at 11.)  Although the Court holds that the NHL is entitled as a matter of law to attorneys' fees incurred in connection with the bankruptcy proceedings and the antitrust suit, the NHL is *not* entitled to attorneys' fees incurred in connection with the NHL's efforts to sell the Coyotes, as the NHL's decision to purchase and/or to sell the Coyotes was not the result of the Club's acts.[7]

Likewise, the NHL's operating losses, as discussed above, do not arise from the Club's acts but rather from the NHL's business decision to purchase the Coyotes in the bankruptcy proceedings and run the franchise in Glendale at a loss.  Because no "act, omission, liability or obligation" of the Club proximately caused the NHL's post-acquisition operating losses, the indemnification clause does not apply to those losses.

## C.    Guaranty Claims (Counts IV and V)

### 1.    Unsecured Claims Purchased by the NHL (Count IV)

Count IV of the Complaint alleges a breach of the Moyes Parties' obligations under the Guaranty for the unsecured claims that the NHL purchased from the unsecured creditors.   (Complaint at ¶¶ 85-92.)   The damages claimed under Count IV were originally $11.6 million, a sum which has been since lowered to $9.3 million.  (Doc. 107 at 41.)

Under the clear language of the Guaranty, the Moyes Parties were liable for the

---

[7] The Moyes Parties did not object to the bankruptcy court's proposed conclusion of law that the NHL is entitled to attorneys' fees accrued after it purchased the team in the bankruptcy on November 2, 2009.  Nonetheless, this Court *sua sponte* reviews this conclusion de novo and concludes that the NHL has no legal grounds for recovering fees it accrued after purchasing the team. *Cf., e.g.*, *Thomas v. Arn*, 474 U.S. 140, 154 (1985) (noting that a district court may conduct *sua sponte* de novo review of a lower court's report and recommendation absent an objection).

unsecured claims before the bankruptcy proceedings.  Defendants agreed to "guarantee the full and punctual payment and performance of all debts, obligations and liabilities of the Club."  (A68.)  The unsecured claims were debts the Club owed to various creditors, and as such, they were "Guaranteed Obligations" under the Guaranty.  (*See id.*)

The Guaranty specifies that it "is an absolute, unconditional, irrevocable, unlimited and continuing guaranty of the Guaranteed Obligations and shall remain in full force and effect and shall be binding upon the Guarantors so long as there is any Guaranteed Obligation outstanding."  (*Id.*)  The issue is whether the unsecured claims continued to constitute outstanding Guaranteed Obligations under the terms of the Guaranty after the NHL purchased them.

The bankruptcy court, in its Report and Recommendation, noted that the NHL asserted "that its bid would pay the legitimate unsecured creditors in full and that it was important to the commercial and business interests of the NHL that these debts [be] paid."  (Doc 235 at 8.)  The court concluded that "the NHL is judicially estopped from asserting that the claims have not been paid."  (*Id.*)

Nevertheless, the word "paid" is not synonymous with the word "extinguished." Treating these two words as the same risks conflating two separate issues:  (1) whether the unsecured creditors received what was owed to them, and (2) whether the debt was extinguished.  When the NHL purchased the unsecured claims, the creditors were fully *paid*, but the debt was *purchased* rather than *paid off*—the claims were not extinguished. The NHL paid the unsecured creditors for the right to collect on the debts by means of an assignment.  In purchasing the claims, the NHL did what it told the court it wanted to do—it protected its commercial and business interests by seeing that the unsecured creditors were paid.

As the bankruptcy court acknowledged, "the terms of the Sales Order stated that the claims were assigned, not paid, and that the claims were not extinguished."  (*Id.* at 7.) The court nonetheless concluded that the NHL was estopped from suing the Moyes Parties under the Guaranty because the NHL misrepresented its position to the court.  (*Id.*

at 5-9.)

Counsel for the NHL and various other attorneys at the October 26, 2009 status conference, held prior to the court's acceptance of the NHL's bid, informed the court that the NHL intended to purchase the claims and then seek recovery from the Moyes Parties under the Guaranty.  NHL counsel explained that it had submitted a written offer—not accepted by the court at the time of the hearing—to purchase and extinguish the claims. (A2249.)  NHL counsel further explained that its amended bid included a proposal to purchase the unsecured claims and that the NHL planned to sue the Moyes Parties to satisfy those claims:  "[W]e had certain remedies against Mr. Moyes, as we've mentioned, there are existing guarantees.  And separate and apart from this case, we believe we have redress to recover under that guarantee."  (A2238.)

During a recess in the hearing, the parties conferred and agreed to submit a stipulated form of order.  NHL counsel expressed on the record the essential points on which the NHL, the debtors, the committee of unsecured creditors, SOF Investments, and Jerry Moyes reached an agreement during the recess.  Regarding the unsecured claims, NHL counsel explained:

> The claims which are to be purchased by the NHL will be approximately 11.6 million. . . .  *Those claims will be held by the NHL* subject to the normal bankruptcy procedures.  However, they will be subordinated in right of payment from the bankruptcy estate to all other unsecured claims with the exception of the claim by Mr. Moyes, who is as Your Honor has heard, not part of the bankruptcy case, has an independent guarantee with the NHL.  Mr. Moyes has explicitly reserved all rights and all defenses which he may have to that guarantee.  And similarly*, the NHL reserves all rights it has against Mr. Moyes, with respect to that guarantee.  But that will be dealt with by the parties, not as part of the process.*

(*Id.* at 32.)

Counsel for the debtor stated, "This amended transaction doesn't really impact the economics to any constituency group other than the ones that are specifically here.  It changed the form, but it didn't specifically change the economics *except as agreed to by the parties that are directly impacted*."  (*Id.* at 36.)  Moyes and his counsel were present at the status conference and agreed to the terms stated by the NHL.

On November 2, 2009, the bankruptcy court entered the Stipulated Order Approving Amended and Clarified Bid, approving the bid memorialized in the NHL's Asset Purchase Agreement.  (A1489-90.)  The Stipulated Order provides that the NHL will purchase the unsecured claims, that the NHL's "purchase of the Unsecured Liabilities does not extinguish the claims underlying the Unsecured Liabilities," that the Moyes Guaranty would be amended "to reduce the maximum cap amount under the guaranty from $30 million to $15 million," and that the NHL and the Moyes Parties would "expressly reserve their respective rights to assert any claims, actions, causes of action and defenses they may have with respect to the Moyes Guaranty, as so amended." (A1493.)

Because the unsecured claims were not extinguished and thus they remained debts owed by the debtors, the claims continued to constitute outstanding Guaranteed Obligations under the terms of the Moyes Guaranty after the NHL purchased them.  The NHL explicitly told the court that once it purchased the claims, it would retain the right to seek recovery on the purchased claims from the non-debtor Moyes Parties under the Guaranty.  The NHL is not judicially estopped from doing so.

The parties have raised no disputed question of fact regarding the Moyes Parties' liability for the unsecured claims; therefore, the Court grants the NHL's motion for summary judgment as to Count IV.

Furthermore, the Moyes Parties agreed under Section 3 of the Guaranty "to pay to the League, on demand, all reasonable costs and expenses (including court costs and legal and accounting expenses) incurred or expended by the League in connection with the Guaranteed Obligations, this Guaranty and the enforcement thereof."  (A68.)  Therefore, the NHL is entitled as a matter of law to reasonable costs and expenses, including attorneys' fees, expended in conjunction with seeking the Moyes Parties' performance under the Guaranteed Obligation to extinguish the unsecured claims.  Because the Moyes Parties' liability under the Guaranty is capped at $15 million and Section 3 is part of the Guaranty, the sum total of the amount of the unsecured claims and the NHL's reasonable

costs and expenses is not to exceed $15 million.  (A1493.)

### 2.      Gretzky Claims (Count V)

The NHL alleged in Count V of its complaint that "[i]f the Coyotes are liable for the Gretzky Obligations, then the NHL has the right to enforce the Gretzky Obligations against the Moyes Parties personally, for the benefit of Gretzky, pursuant to the terms of the Guaranty."  (Complaint at ¶ 94.)

As discussed above, the Moyes Parties promised under the Guaranty to "absolutely and unconditionally and irrevocably, to and for the benefit of the League . . . guarantee the full and punctual payment and performance of all debts, obligations and liabilities of the Club," and this obligation remains "in full force and effect . . . so long as there is any Guaranteed Obligation outstanding."  (A68.)  The Club owed Gretzky a debt, which constituted a Guaranteed Obligation under the clear terms of the Guaranty.  (*See id.*)  The issue is whether that Guaranteed Obligation remains "outstanding."

Unlike the unsecured claims, neither the transcript from the October 26, 2009 status conference nor the language of the stipulated sale order suggest that the NHL purchased the Gretzky claims.  Whereas the stipulated sale order specified that the NHL purchased the unsecured claims and that such claims were not extinguished, (A1493,) there is no such mention of the Gretzky claims in the sale order.  Rather, the stipulated sale order provides that "[t]he transfer of the [Coyotes'] Assets to the Buyer [NHL] under the APA will be . . . free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the 'Interests')."  (A1494.)  The sale order further explains that the NHL can purchase the Franchise "free and clear of any Interests of any kind . . . because in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied."  (*Id.*)     The Gretzky claims constituted an "Interest."  By the terms of the stipulated sale order, "[a]ll holders of Interests are adequately protected by having their Interests attach to the proceeds [of the debtor estate, in order of priority]."  (A1495.)  Thus, at least at the time that the sale

order was entered, the Gretzky claims, unlike the unsecured claims, had not been purchased by the NHL and were subject to the bankruptcy process.

The NHL asserted during oral argument that the NHL purchased the Gretzky claims "subsequent to all of the bankruptcy, not at the time of the bankruptcy," at some point "in November of 2013." (Doc. 148 at 58.) The NHL has never cited to any part of the record in support of this assertion. Consequently, the Court lacks evidence to suggest that the NHL in fact owns the Gretzky claims. *See* Fed. R. Civ. P. 56(c)(1)(A) (a party must support an assertion by citing to particular parts of the materials in the record); Fed. R. Civ. P. 56(c)(3) (in its summary judgment analysis "[t]he court need consider only the cited materials"); *Southern Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 889 (9th Cir. 2003) ("General references without page or line numbers are not sufficiently specific.").

Nevertheless, whether or not the NHL owns the Gretzky claims, those claims remain outstanding obligations under the Guaranty so long as they have not been extinguished. The Moyes Parties have presented no evidence suggesting that the Gretzky claims have been extinguished. Rather, the Moyes Parties assert that because the debt was discharged in the bankruptcy, any third party guaranty of such debt is likewise discharged. (A384-86). However, it is settled law that a bankruptcy proceeding "discharges the debtor of any debt that arose prior to the confirmation," but that the discharge "does not result in the extinguishment of the underlying debt." *Star Phoenix Min. Co. v. W. Bank One,* 147 F.3d 1145, 1147 n.2 (9th Cir. 1998). "[A] bankruptcy court does not have the power to discharge the liabilities of a bankrupt's guarantor." *Id.*

In *Star Phoenix*, the issue presented was "whether [the creditor had] received full satisfaction of the amounts owed to it." *Id.* at 1147. The Ninth Circuit explained:

> If, by accepting the terms of the proposed reorganization plan, [the creditor] stipulated that the collateral it received fully repaid the amounts owed, then [the creditor] should now be precluded from collecting against [the guarantors]. Such full satisfaction would in itself release [the guarantors'] obligation under the guaranty because there would be no outstanding debt. If, however, the plan does not determine the status of the debt owed to [the creditor], but rather resolved only how much [the debtor] owed [the creditor] in the bankruptcy context, then [the creditor] is entitled to recover the outstanding debt under the guaranty agreement.

1    *Id.*  The court concluded that the payment the creditor had received under the bankruptcy

2    plan "did not fully satisfy the debt owed" to it.  *Id.*  Although the creditor could not seek

3    to recover the remaining deficiency from the debtor, it could seek its remaining

4    deficiency from the guarantors of the debt.  *Id.*

5         Likewise, here, the pro rata share distribution that Gretzky received did not

6    amount to full satisfaction of the amount owed to him.  Gretzky could not seek the

7    remaining deficiency from the debtor parties, as those debts were discharged in the

8    bankruptcy.  Nonetheless, the debts were not extinguished, and therefore they remain

9    Guaranteed Obligations under the Moyes Parties' Guaranty.

10        The NHL has the right, pursuant to the Guaranty, to seek payment from the Moyes

11   Parties for any non-extinguished debt, whether or not that debt has been purchased by the

12   NHL.  The Moyes Parties assert that "[t]he NHL seeks a windfall here by making a claim

13   on 'behalf' of Gretzky."  (A386.)   However, the NHL has asserted that "[i]f the Coyotes

14   are liable for the Gretzky Obligations, then the NHL has the right to enforce the Gretzky

15   Obligations against the Moyes Parties personally, *for the benefit of Gretzky*, pursuant to

16   the terms of the Guaranty."  (Complaint at ¶ 94) (emphasis added).  Under the Guaranty,

17   the Moyes Parties guaranteed to the NHL the Club's debts owed to parties other than the

18   NHL.  (A68.)  The language of the Guaranty specifies that the promises the Moyes

19   Parties made under the Guaranty are "to and for the benefit of the League."  (*Id.*)

20   Reading the language of the Guaranty as a whole, extinguishing debts owed to other

21   creditors is "to and for the benefit of the League."  (*Id.*)  The NHL can enforce the

22   Guaranty "for the benefit of Gretzky," (Complaint at ¶ 94,) and doing so is "to and for the

23   benefit of the League."  (A68.)

24        The bankruptcy court proposed as a conclusion of law that "[t]he NHL's claim

25   against Moyes for the unpaid amounts owed Gretzky [is] barred by the doctrine of

26   judicial estoppel."  (R & R, Doc. 98 at 13.)  "Judicial estoppel, sometimes also known as

27   the doctrine of preclusion of inconsistent positions, precludes a party from gaining an

28   advantage by taking one position, and then seeking a second advantage by taking an

incompatible position." *In re Hoopai*, 581 F.3d 1090, 1097 (9th Cir. 2009) (quoting *Whaley v. Belleque,* 520 F.3d 997, 1002 (9th Cir. 2008) (quoting *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir. 1996))). "It is an equitable doctrine invoked by a court at its discretion." *Id.* (quoting *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990))). Judicial estoppel "is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts." *Id.* (quoting *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (quoting *Wagner v. Prof'l Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1044 (9th Cir. 2004))). In determining whether to apply the doctrine, a court "typically consider[s] (1) whether a party's later position is clearly inconsistent with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to derive an unfair advantage or impose an unfair detriment on the opposing party." *Id.* (quoting *United States v. Ibrahim,* 522 F.3d 1003, 1009 (9th Cir.2008) (quoting *New Hampshire v. Maine,* 532 U.S. at 750-51)).

Here, according to the bankruptcy court, the NHL's approved bid and the stipulated sale order "effectively treated [the] creditors exactly as the prior and unapproved NHL bid; namely all creditors were paid in full except Moyes and Gretzky. . . . The NHL controlled the sale proceeds because it did not want any of the sales proceeds paid to either Moyes or Gretzky."[8] (*Id.* at 6-7.) The court concluded that it is inconsistent for the NHL to effectively control the proceeds in such a way as to divert the proceeds away from Gretzky and then to claim that the amount unpaid to Gretzky constitutes an outstanding Guaranteed Obligation under the Moyes Parties' Guaranty. (*Id.* at 6-7.) It further concluded that allowing such a claim grants the NHL "an unfair advantage" and imposes "an unfair detriment" on the Moyes Parties. (*Id.*).

Without a doubt, the Sale Order worked to the NHL's advantage. Nonetheless, the

---

[8] The court pointed out that "Gretzky was given every opportunity to object to the NHL's offer and did not object." (*Id.* at 6.)

NHL did not gain this advantage by successfully asserting one position and then taking a different, incompatible position. The NHL represented to the bankruptcy court that it intended to pursue its claims under the Guaranty against the Moyes Parties before it successfully convinced the court to accept its modified second bid and enter the stipulated sale order. (A2238.) The stipulated sale order specifies that the NHL expressly reserved its right "to assert any claims, actions, causes of action and defenses . . . with respect to the Moyes Guaranty." (A1493.) That the Court may have failed to perceive possible legal claims the NHL had against the Moyes Parties under the Guaranty is not attributable to any conflicting position advanced by the NHL.

Moreover, the restructured distribution of the sale proceeds did not result in an "unfair detriment" to the Moyes Parties. Regardless of how the sale proceeds were distributed, the Moyes Parties are liable under the Guaranty for any debts remaining after the proceeds distribution. Had the proceeds been distributed differently, the Moyes Parties would be liable for the same amount—the sum of the remaining balances on any debts not fully extinguished by the proceeds.[9]

Therefore, the NHL is not judicially estopped from enforcing the Guaranty against the Moyes Parties for the Gretzky claims. Because the Moyes Parties have failed to raise a genuine issue of material fact suggesting that the Gretzky claims are extinguished, the Court grants summary judgment to the NHL on the Moyes Parties' liability for the Gretzky claims.

The parties further dispute whether the Gretzky claims are subject to the $15 million cap. The Sale Order states that "The NHL agrees, at the request of the Creditors' Committee, to amend the Moyes Guaranty to reduce the maximum cap amount under the guaranty from $30 million to $15 million." The Sale Order does not mention any

---

[9] The Moyes Parties were themselves debtors, and they would have received a larger pro rata share of the sale proceeds had the proceeds been distributed differently. But that presumably would have left a greater amount of non-extinguished debt owed to other creditors, for which the Moyes Parties would have been liable under the Guaranty. The end result is the same.

1    exceptions or limitations to the $15 million cap on the Moyes Parties' liability for

2    obligations under the Guaranty.   However, the Guaranty specified that the Moyes

3    Parties' payments of Club obligations would not count toward the $30 million cap in

4    certain situations, including "obligations owing to any Investment Party . . . ."  (A68.)

5    Gretzky is an "Investment Party," as defined in the Consent Agreement.[10]  (A27.)

6          Under New York law, "agreements are construed in accord with the parties'

7    intent," the best evidence of which is "what they say in their writing."  *Greenfield v.*

8    *Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations omitted).   "[A]

9    written agreement that is complete, clear and unambiguous on its face must be enforced

10   according to the plain meaning of its terms."  *Id.*   "Extrinsic evidence of the parties'

11   intent may be considered only if the agreement is ambiguous, which is an issue of law for

12   the courts to decide."  *Id.*   "A contract is unambiguous if the language it uses has a

13   definite and precise meaning, unattended by danger of misconception in the purport of

14   the agreement itself, and concerning which there is no reasonable basis for a difference of

15   opinion."  *Id.* at 569-79 (internal citations omitted).

16         The Sale Order is silent as to whether the $15 million liability cap in the Sale

17   Order comprises the exclusions that applied to the Guaranty's original liability cap.

18   Ordinarily, "silence does not equate to contractual ambiguity," and therefore "the failure

19   of a contract to address certain [matters]" does not entitle a court "to look beyond the four

20   corners of the document."  *Id.* at 573.   "[A]n ambiguity never arises out of what was not

21   written at all, but only out of what was written so blindly and imperfectly that its meaning

22   is doubtful."   *Id.* (quoting *Trustees of Freeholders & Commonalty of Town of*

23   *Southampton v. Jessup,* 173 N.Y. 84, 90 (1903)).

24         Here, however, the clause at issue in the Sale Order was written imperfectly such

25   that its silence regarding exclusions is ambiguous.  The Sale Order states that "[t]he NHL

26   agrees . . . to amend the Moyes Guaranty to reduce the maximum cap amount under the

27   _____

28   [10] The Guaranty specifies that "[c]apitalized terms not otherwise defined herein shall
     have the respective meanings set forth in the Consent Agreement."  (A67.)

guaranty from $30 million to $15 million."  (A1493.)  One reasonable interpretation of this language is that claims arising under the Guaranty are now capped at $15 million, and the silence as to any exclusions indicates that in the amended form of the Guaranty, no such exclusions exist.  Another reasonable interpretation is that the new cap amount applies to only those claims that would have been subject to the old cap amount under the original terms of the Guaranty, and the Sale Order's silence as to any exclusions indicates that those exclusions in the Guaranty have not been amended and remain valid.  Because there is a "reasonable basis for a difference of opinion," the language of the Sale Order is ambiguous as a matter of law.  *Greenfield*, 98 N.Y.2d at 569-70.

Under New York law, where contractual terms are ambiguous, "it is proper to consider extrinsic evidence in interpreting the ambiguous terms, irrespective of the parol evidence rule."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008).  "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."  *Id.* at 68.

That is not the case here.  The Court thus "need not determine which is the more likely interpretation," but rather leaves the interpretation of the clause to the fact finder."  *Mellon Bank, N.A. v. United Bank Copr. Of New York*, 31 F.3d 113, 115 (2d Cir. 1994).  The Court thus denies summary judgment on the issue of the scope of the $15 million cap on the Moyes Parties' liability under the terms of the Sale Order.

## CONCLUSION

The NHL's tort claim for aiding and abetting a breach of fiduciary duty is preempted by the Bankruptcy Code, and as such, the Moyes Parties are entitled to summary judgment on Count III.

The NHL's breach of contract claim under the Consent Agreement as alleged in Count I of its Complaint is preempted except to the extent that it alleges pre-filing

breaches, as to which the Court grants summary judgment to the NHL as to liability. Regarding damages, the NHL is precluded as a matter of law from seeking its operating expenses or any other losses caused by the NHL's business decision to purchase the Coyotes.

Neither judicial estoppel nor bankruptcy preemption bars the NHL's breach of contract claim under Section 11(c) (the indemnification clause) of the Consent Agreement. The Moyes Parties have raised no genuine issue of material fact regarding liability under Section 11(c). The NHL is therefore entitled to summary judgment regarding liability on Count II. Regarding damages, the NHL is entitled to reasonable costs and attorneys' fees related to the bankruptcy proceeding and antitrust suit. Here too, the NHL is precluded as a matter of law from seeking its operating expenses or any other losses caused by the NHL's business decision to purchase the Coyotes.

The NHL is entitled to summary judgment for its claims under Count IV, as the Moyes Parties are liable as guarantors for the unsecured claims purchased by the NHL. The NHL is entitled as a matter of law to reasonable costs and expenses, including attorneys' fees, expended in conjunction with seeking the Moyes Parties' performance under the Guaranty to extinguish the unsecured claims. The combined amount of the unsecured claims and the NHL's related expenses must not exceed the cap under the Guaranty of $15 million.

The NHL is entitled to summary judgment for its claims under Count V, as the Moyes Parties are liable as guarantors for the non-extinguished debt constituting the Gretzky claim, and the NHL has the right to enforce the Guaranty for the benefit of Gretzky.

The Court denies summary judgment on the issue of the scope of the $15 million cap on the Moyes Parties' liability, as the terms of the Sale Order are ambiguous.

/ / /

/ / /

/ / /

**IT IS THEREFORE ORDERED** that:

1.       The Report and Recommendation of the Bankruptcy Court (Doc. 98) is **ACCEPTED IN PART** and **REJECTED IN PART**.

2.       Plaintiff's Motion for Summary Judgment (A580, A756) is **GRANTED IN PART** and **DENIED IN PART**.

3.       Defendants' Motion for Summary Judgment (A305, A702) is **GRANTED IN PART** and **DENIED IN PART**.

Dated this 12th day of November, 2015.

_____
Honorable G. Murray Snow
United States District Judge